No. 03-297

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 221

IN THE MATTER OF THE
MENTAL HEALTH OF T.M.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. ADI-03-002 (D),
The Honorable Dirk M. Sandefur, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Lawrence A. LaFountain, Deputy Public Defender, Great Falls, Montana

      For Respondent:

          Hon. Mike McGrath, Attorney General; Pamela P. Collins,
Assistant Attorney General, Helena, Montana

          Brant Light, Cascade County Attorney; Marvin Anderson, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs: January 27, 2004

Decided:   August 18, 2004

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1      T.M. was committed by the Eighth Judicial District Court, Cascade County, to the Montana State Hospital in Warm Springs for a period not to exceed ninety days. This period of commitment was to be followed by an outpatient treatment regimen to be administered by the Benefis Health Care psychiatric facility in Great Falls. T.M. appeals the commitment order and seeks dismissal of this case.

¶2      We restate the issues on appeal as follows:

¶3      1) Whether T.M.'s counsel was ineffective in failing to secure a continuance of the trial so he could attempt to locate an expert witness to testify regarding the general ability of mentally ill homeless persons to care for themselves.

¶4      2) Whether the District Court erred in allowing T.M. to remain in the courtroom during his trial.

¶5      3) Whether the District Court erred in denying T.M.'s request for continuance to obtain private counsel.

¶6      We affirm the District Court.

## STANDARD OF REVIEW

¶7      Involuntary commitment proceedings are civil in nature. *In the Matter of the Mental Health of L.C.B.* (1992), 253 Mont. 1, 7, 830 P.2d 1299, 1303. Montana's civil commitment laws are to be strictly adhered to. *In re Mental Health of T.J.D.*, 2002 MT 24, ¶ 20, 308 Mont. 222, ¶ 20, 41 P.3d 323, ¶ 20. Issues of due process and right to counsel are subject to plenary review. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 17, 306 Mont. 1, ¶ 17, 29 P.3d 485, ¶ 17. Rulings on motions for continuance are discretionary and reviewed for

2

abuse of discretion. *In re R.F.*, 2001 MT 199, ¶ 21, 306 Mont. 270, ¶ 21, 32 P.3d 1257, ¶ 21.

## DISCUSSION

### Issue One

¶8      Whether T.M.'s counsel was ineffective in failing to secure a continuance of the trial so he could attempt to locate an expert witness to testify regarding the general ability of mentally ill homeless persons to care for themselves.

¶9      T.M.'s right to effective assistance of counsel derives from § 53-21-101(4), MCA, which requires due process of law be accorded any person subject to a petition for involuntary commitment.   In *In re Mental Health of K.G.F.*, interpreting what effective assistance of counsel entails in an involuntary commitment proceeding, we set forth a list of guidelines, some statutory some not, counsel are required to comport with in order to be effective. *In re Mental Health of K.G.F.*, 2001 MT 140, 306 Mont. 1, 29 P.3d 485.

¶10     Applying those guidelines to the matter before us, we note first that the facts of the case as drawn from the record, compared to what has been requested on appeal, create some confusion.

¶11     The petition for commitment was filed on February 3, 2003.  That same day the court entered an order appointing the Cascade County Public Defender's office to represent T.M. The court held the initial appearance, required by § 53-21-122, MCA, on February 4, 2003. Lawrence LaFountain appeared on behalf of T.M., who was present.

¶12     On February 6, 2003, the court held a status hearing on the petition.  At the outset of the hearing, LaFountain requested the court set a date for a jury trial.  The court set February

3

10, 2003, as the trial date. LaFountain asked the court for a continuance until February 17th so that he would have time to secure an examination by a psychiatrist of T.M.'s choosing. This is a right accorded to T.M. if the exam is reasonably available. Section 53-21-115(9), MCA. Attorney Anderson, for the State, reminded everyone that according to statute the trial had to be held within seven days of the request for jury trial. LaFountain stated that this could be waived by respondent. The court, attempting to stay within the confines of the statute, denied LaFountain's request for a delay of the trial. LaFountain stated his intent to object to denial of the continuance. At that point, T.M. interjected and said it would be fine with him if a psychiatrist from Warm Springs examined him. Judge McKittrick ordered the exam be performed at Warm Springs.

¶13 Thus, at this point LaFountain had asked for a continuance specifically to obtain an evaluation by a professional of T.M.'s choosing. No mention had yet been made concerning the necessity of securing an expert on homelessness. The court denied the motion for continuance. However, T.M. agreed to be examined by a psychiatrist from Warm Springs and the court had so ordered. The denial of a continuance to obtain an examination by someone other than the Warm Springs psychiatrist has not been appealed.

¶14 On the day of trial, prior to T.M.'s arrival at court, LaFountain informed Judge Sandefur, who had assumed jurisdiction, that T.M. had been evaluated by Dr. Shet at Warm Springs. LaFountain again questioned whether this was appropriate given that Dr. Shet is a State doctor. Additionally, LaFountain made an observation that the time was too short to obtain the services of an expert witness who could testify as to the lifestyles and self-sufficiency of homeless, mentally ill persons. LaFountain stated as follows:

4

Another difficulty in this is that, depending on what section the client is charged under, other experts become important and . . . the State has to show that if he did not undergo treatment that he would deteriorate. And in such a situation an expert could be very beneficial to the respondent. An expert that knows about homeless people and the life they live, because a large number of our homeless people are mentally ill, persons who are not on medications and not undergoing treatment and they survive. That type of testimony could help us overcome the State's testimony in this case. But not having a continuance, it's highly unlikely that we could find an expert to come in and testify in that regard.

¶15 T.M. does not argue on appeal that he was unlawfully denied access to a second professional opinion. Rather, T.M.'s brief on appeal argues that this pre-trial dialogue was equivalent to making a motion for a continuance to secure an expert witness on homelessness which the District Court improperly denied.

¶16 However, LaFountain never actually made a motion for continuance to obtain such an expert as evidenced by the following:

Court: So having stated that background, Mr. LaFountain, it's my understanding that, I want to confirm this, that you're basic issue here as far as the time period goes, or discussion of the continuance is not that Judge McKittrick has perhaps improperly refused to grant you a continuance, but that there is an inherent conflict in the statutory time requirement of 53-21-125 on the one hand, and the respondent's desire and need to conduct sufficient pretrial preparation on the other. Specifically, to locate, if necessary an acceptable professional person, independent professional person to conduct an evaluation; is that correct?

LaFountain: Yes, your Honor. I believe there is inherent conflict. I'm not prepared to - I'm just saying there it is. The legislature has made it. They said you have to have the trial within seven days . . . . 53-21-125 says that, so it puts us in a position that is very hard to get a doctor for that second opinion, and it is also very hard to round up other experts if they were needed, such as I indicated in this case. We could certainly use an expert in regard to the lives of homeless people, their mental illness, and if they're able to live a life out.

Court: Very well. I understand. So having made that record, it's my understanding from our discussions that when we in the chambers, you wanted

5

to make the record for potential appeal on this issue, but you saw that there was at least no statutory reason at this point in time to - that would bar us from proceeding today; is that correct?

LaFountain: That's correct, your Honor.

¶17 Having made a confusing record for potential appeal, LaFountain agreed to proceed with trial as required by the statutory scheme. That there was no motion for continuance to obtain an expert witness eliminates the implication that the District Court erred in denying such request. The court was not presented with anything to deny. We do not address issues raised for the first time on appeal because it is unfair to fault the trial court on an issue it was never given opportunity to consider. *In re Marriage of Killpack*, 2004 MT 55, ¶ 10, 320 Mont. 186, ¶ 10, 87 P.3d 393, ¶ 10.

¶18 T.M.'s argument on appeal with respect to procurement of an expert witness on homelessness is that counsel was ineffective for failing to procure such an expert. This also includes any allegation that counsel was ineffective because he did not make a motion to continue the trial to secure such an expert opinion, assuming such was available. We believe this argument misses the point. Section 53-21-126(1), MCA, states that, "[t]he trial must be limited to the determination of whether or not the respondent is suffering from a mental disorder and requires commitment. At the trial, the court shall consider all the facts relevant to the issues of whether the respondent is suffering from a mental disorder." This statute specifically limits the presentation of evidence to that which is relevant to a particular respondent's condition. At trial LaFountain argued that:

> [D]epending on what section the client is charged under, other experts become important and . . . the State has to show that if he did not undergo treatment that he would deteriorate. And in such a situation an expert could be very

6

beneficial to the respondent. An expert that knows about homeless people and the life that they live, because a large number of our homeless people are mentally ill, persons who are not on medications and not undergoing treatment and they survive. That type of testimony could help us overcome the State's testimony in this case. But not having a continuance, it's highly unlikely that we could find an expert to come in and testify in that regard.

¶19    While we agree that the strict time constraints make advocacy challenging, on balance we do not believe the District Court abused its discretion. LaFountain may have been correct in stating that an expert opinion such as he described might, if available, have been evidence that some mentally ill homeless people are able to survive. Yet, the statute clearly mandates that evidence be limited to respondent's own particular set of circumstances. We must acknowledge the likelihood that some mentally ill homeless persons survive untreated, but we are tasked with determining whether an individual, in this case T.M., with his particular problems, would be able to do so. As pointed out by the State, any testimony given by an expert witness on the general tendencies of the mentally ill homeless would not have rebutted the testimony offered by the State that T.M. himself was not capable of surviving on his own.

¶20    Based on the record before us, we conclude that LaFountain did not ineffectively represent T.M.

**Issue Two**

¶21    Whether the District Court erred in allowing T.M. to remain in the courtroom during his trial.

¶22    On appeal, T.M. states that he made several outbursts during voir dire that potentially prejudiced his case.

¶23 T.M. had a statutory right to be present at his trial. Section 53-21-116, MCA. Under § 53-21-119(1), MCA, a respondent can waive his rights, or if respondent is not capable of making intentional and knowing decisions his rights can be waived at the request of his attorney and friend. Under § 53-21-119(2), MCA, the right to be present at trial can be waived via a joint request by respondent's attorney and friend, with the concurrence of the judge and the professional person if:

> (a) the presence of the respondent at the hearing would be likely to seriously adversely affect his mental condition; and
> (b) an alternative location for the hearing in surroundings familiar to the respondent would not prevent such adverse effects on his mental condition.

¶24 Before T.M. arrived at trial, LaFountain informed the court that it was likely that T.M. would be aggressive toward counsel. LaFountain was concerned that this would prejudice T.M. to the jury and wanted the court to be aware that he would ask for a recess to remove T.M. if he felt it necessary. LaFountain also told the court that he had had no contact with T.M.'s appointed friend, that the friend had not appeared at the hearings, and that he did not believe that the friend had had contact with T.M. He suggested that a new friend be appointed. Mr. Anderson then informed the court that the appointed friend was ill and in the hospital.

¶25 Mr. Anderson went on to explain to the court that in prior cases the waiver provisions of § 53-21-119(2), MCA, had typically only been invoked when a respondent was so ill or incapacitated that to bring him to court would require extraordinary effort and would so disrupt his routine or lifestyle that more harm than good would result. Anderson instead likened the situation to one in which an uncooperative defendant became unruly in court and

had to be removed to ensure a fair trial. The court and LaFountain agreed that § 53-21-119(2), MCA, was not applicable to the situation at hand. The court, however, was sympathetic to LaFountain's invocation of § 53-21-119(1), MCA, which allows counsel and the friend to waive a respondent's right to be present if respondent is not capable of making a knowing decision. At the same time, the court was also very concerned that T.M. not be excluded if it were not absolutely necessary.

> Court: I guess my concern . . . is that don't just focus on the constitutional of his right to fair trial and overlook his statutory right to be present and the right under 53-21-119, to waive that. I understand the argument of both counsel that yes, we could waive it under that statute. If the friend was here, if we appointed a new friend. You're also asserting to me, both of you, as I understand it, that you feel that the Court could independently remove him from the facts of this case, understood to remove his right in order to have a fair trial.

> LaFountain: I believe that's correct your Honor. . . .

> Court: Okay. Very well then. What we will do then is when he gets on site here, I think that at a minimum we should have him here in chambers and speak with him. If you want to consult with him prior . . . that would be fine. And I would recommend that you do so and then if you will bring him in here and if you're prepared to make a motion to exclude him . . . for the reasons that we have discussed, I will entertain that and discuss or question him at that time and make some sort of an assessment as to what I think about that. If you're not prepared to make that motion we are going to proceed with the trial.

¶26 When T.M. arrived the court reminded him what the proceedings were about, offered him a chance to make objections, and warned him that he had to behave in the courtroom.

> Court: I have also been informed that you're a little bit upset and maybe on the fight a little bit and that there is some concern that if you are that you might cause a disruption in the courtroom and interrupt the proceeding, but more importantly, seriously effect your ability to get a fair trial. Because if there's any kind of disturbance in there you don't want the jury to think badly of you because you're upset. Do you understand that?

9

T.M.: Yes and no.  What makes you think - I have been nothing . . .

Court: That's why we are having this discussion, to make sure so that you can . . . .  I want you to be there.  And you want to be there too, but I need to tell you that you need to, you know, conduct yourself in there with ordered fashion and I will listen to what you have to say at the appropriate time.

T.M.: I understand.

Court: Is it your intent to go?

T.M.: I will be very obedient.

With this and a number of subsequent assurances from T.M. that his behavior would be appropriate, the court proceeded to voir dire.

¶27　At the beginning of voir dire T.M. blurted out, "Sir, I call a mockosoona trial.  I'd like that noted.  There's more than three jurors that never showed up.  This case should be thrown out of court or I'm going to sue the State."  To which the court responded, "Your objection is noted [T.M.].  We are going to proceed."  Toward the end of LaFountain's initial voir dire T.M. broke in and stated, "I'd like 163, 169, 174a, 118, 237a, nine and three.  I'd like them all noted please."  Later, as LaFountain was further examining jurors, T.M. broke in and said, "Hard to believe he's my lawyer isn't it?  He might as well work for the other side, excuse me, Judge."

¶28　After jury selection, but outside the presence of the jury, LaFountain renewed his request for T.M. to be removed from the courtroom.  His primary concern was that T.M.'s family would be testifying against T.M. and that their testimony would severely agitate him.  Anderson shared LaFountain's concern and did not oppose the request.  The court, on the other hand, was still concerned with violating T.M.'s fundamental right to be present and

analogized the situation to the high burden that must be met to exclude a criminal defendant from his trial.

> Court: I guess what's in conflict here is my duty to make sure that [T.M.] is afforded a fair trial here, is bumping up against the issue of - or the duty to try to - responsibility to try to protect him from prejudicing his own right to a fair trial. Which is an interesting conflict. But, [T.M.], what do you think about this?
>
> T.M.: I will be quite [sic] and watch.

The court continued further in his explanation of the circumstances to T.M. at the end of which T.M. stated, "Thank you. That's all I wanted to know. I will be quite [sic] and be respectful."

¶29 There is no evidence in the record that T.M. made any further outbursts during trial. While counsel alleges in an affidavit appended to his brief on appeal that T.M. continued to mutter and mumble disparaging comments from the counsel table loudly enough to be heard by the jury, we are left with the fact that none of them were apparently disruptive enough to cause the court to reprimand T.M., nor to cause counsel to seek a recess to reconsider T.M.'s presence in the courtroom. Further, the affidavit is not part of the record pursuant to Rule 9(a), M.R.App.P., and will not be regarded as evidence in this appeal.

¶30 T.M. made three relatively innocuous statements during voir dire. He then settled down and was calm for the remainder of trial. This record does not justify a conclusion by this court that T.M.'s behavior was so prejudicial that the jury would not have been able to take an objective look at the evidence presented. The District Court was quite cognizant of the need to protect T.M.'s rights and we hold that it did not abuse its discretion in allowing T.M. to remain in the courtroom.

11

**Issue Three**

¶31    Whether the District Court erred in denying T.M.'s request for continuance to obtain private counsel.

¶32    At the initial hearing, the court advised T.M. of his rights under § 53-21-115, MCA. T.M. stated that he understood his rights and requested a jury trial. The court told T.M. to have his attorney file papers requesting a jury trial and also advised T.M. to speak with his attorney about whether to seek an independent evaluation. T.M. said, "okay," and LaFountain thanked the court. At the February 6, 2003, status hearing things again went smoothly.

¶33    LaFountain ably advocated on T.M.'s behalf at both the initial hearing and the status hearing, and there appeared to be no initial conflict between the two. On the day of trial, LaFountain advised the court that he was concerned that the court-appointed "friend" was ill and was unable to attend trial, and that T.M. might potentially prejudice his case by being combative and having outbursts in front of the jury. LaFountain informed the court that T.M. was angry with counsel for not having gotten "a second opinion."

¶34    Upon T.M.'s arrival at trial, T.M. told Judge Sandefur, in chambers, that he wanted a new court-appointed lawyer because LaFountain was incompetent and T.M. was "not happy with what he's done." T.M. complained that LaFountain failed in not obtaining the services of a professional to perform an independent evaluation on him, stating, "[h]e should have set up a second opinion or even a third opinion from the psychologist to have me judged. I think he's less than competent." When reminded by the court that he had been seen by Dr. Shet, and informed by the court that LaFountain had said that T.M. and

12

LaFountain were not accepting Dr. Shet's report, T.M. contradicted LaFountain's statements and told the court that Dr. Shet's opinion was "fine." When pressed by the court about whether he would accept Dr. Shet's report, T.M. responded, "Yes, I will." T.M. then reiterated to the court that he did not want LaFountain as his lawyer. The court noted that while it was aware of some issues between T.M. and LaFountain, there was no legal basis to remove LaFountain as T.M.'s counsel.

¶35 T.M. protested again and the court informed him that if he had funds from which to pay a private attorney, he could hire anyone he chose. T.M. asked the court for time to hire a private attorney. The court asked T.M. if he had means to hire an attorney to which T.M. responded, "I can make some calls and I can make it happen. I thought the State would have a lawyer that would be more competent . . . . I realize this man is not on my side. He's riding the fence." The court acknowledged T.M.'s concerns, but again concluded there was no cause to remove LaFountain, and proceeded with the trial.

¶36 Section 53-21-117, MCA, allows that a respondent "may" secure an attorney of his choice at his own expense. On appeal, T.M.'s sole claim is that because he made a "timely" request for a continuance to hire new counsel that he is automatically entitled to a continuance. There is no Montana case law interpreting this particular nuance of this section.

¶37 While we mark significant distinctions between the purposes of commitment proceedings and criminal proceedings, we believe that some attorney/client principles embodied in our criminal jurisprudence are apropos to both. We have held that, "effective assistance of counsel does not require that the defendant have confidence in appointed

13

counsel." *State v. Colt* (1992), 255 Mont. 399, 404, 843 P.2d 747, 750. We have held that unless a defendant has made a good faith effort to obtain substitute counsel before the scheduled trial date, a request for continuance to obtain counsel is dubious and fraught with uncertainties and contingencies. *State v. Garcia*, 2003 MT 211, ¶¶ 21-22, 317 Mont. 73, ¶¶ 21-22, 75 P.3d 313, ¶¶ 21-22.

¶38 In interpreting § 53-21-122(2), MCA, we have stated that upon a district court's appointment of counsel, a respondent may request different counsel or may retain alternative representation "for good cause shown and based on compelling reasons . . . ." *K.G.F.*, ¶ 72.

¶39 All of the foregoing suggest or demand that there be good cause and a compelling reason shown when a respondent seeks to dismiss his counsel on the day of trial. We are persuaded that this is the appropriate standard to apply to last minute requests to dismiss court-appointed counsel.

¶40 In this case, T.M.'s only complaint at trial was that his attorney did not obtain for him a second, independent, psychiatric evaluation, and that he felt that LaFountain was on the fence. Yet T.M. himself agreed to evaluation by Dr. Shet at Warm Springs and later insisted to the court that he would accept Dr. Shet's evaluation. There is no other evidence in the record suggesting that LaFountain did not advocate on T.M.'s behalf to the best of his ability. The mere fact that T.M. repeatedly changed his mind about who he would accept as an independent evaluator is not a sufficiently exceptional circumstance to justify prolonging a trial in order for T.M. to "make some calls" when, considering T.M.'s indigent status, it is highly unlikely that he would have found an attorney to take his case.

¶41 The District Court did not abuse its discretion in denying the motion for continuance.

14

¶42     Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART