FILED

03/15/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0412

DA 20-0412

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 51N

IN THE MATTER OF:

T.A.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADI-2020-26
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Danny Tenenbaum, James Reavis,
          Assistant Appellee Defenders, Billings, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bree Gee, Assistant Attorney
          General, Helena, Montana

          Leo Gallagher, Lewis and Clark County Attorney, Helena, Montana

          Submitted on Briefs:  February 2, 2022

                    Decided:  March 15, 2022

Filed:

                    _____
                            Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Respondent and Appellant T.A. appeals from the June 25, 2020 Findings of Fact, Conclusions of Law and Order issued by the First Judicial District Court, Lewis and Clark County, which involuntarily committed her to the Montana State Hospital (MSH) at Warm Springs for up to 90 days.  We affirm.

¶3     On June 19, 2020, the State filed a Petition Alleging Mental Disorder that Requires Treatment, alleging T.A. suffered from a mental disorder and required commitment.  The Petition was accompanied by a report from Dr. Courtnay Crowell, MD, a professional person at the Lewis and Clark County Detention Center (LCDC), which recounted T.A.'s history in the community and at LCDC.  The report noted T.A. had been arrested eight times since she became known to the community of Helena in October 2019, had been charged with 15 counts of assault in that time, had assaulted jail staff during discharge on June 15, and attacked both officers and a physician during an attempted examination on June 16.  Dr. Crowell's report asserted T.A. was "gravely disabled by a mental disorder which is not yet diagnosed (due to her poor cooperation with interview and examination on multiple occasions)" and noted T.A., while at LCDC, would stay under a blanket day

2

and night; defecate and urinate on the floor of her cell, though there was a toilet available; and refused to speak with, and attacked, both mental health personnel and LCDC officers when they would approach her. Dr. Crowell noted T.A. had previously been committed to MSH and was diagnosed with malingering for shelter and an unspecified personality disorder with antisocial traits during that stay. Regarding T.A.'s present behavior, Dr. Crowell determined T.A. suffered from a severe mental illness, was a danger to herself and others, and a diagnosis of malingering for shelter was no longer appropriate. Dr. Crowell requested T.A. be treated at MSH.

¶4 On June 19, 2020, the District Court found probable cause to believe T.A. suffered from a mental disorder which required commitment and appointed an attorney for T.A. The District Court held the initial appearance on the State's petition outside of T.A.'s cell. T.A. remained inside of her cell, hidden under the covers, during the initial appearance. The court informed T.A. of the State's petition, informed her of her rights, and notified T.A. the commitment hearing would be held on June 23, 2020. The District Court asked T.A.'s attorney if she had spoken with T.A. about appointing a friend of respondent. T.A.'s attorney responded that she had asked T.A. the question, but did not receive a response. The court further appointed Dr. Crowell to perform a follow-up examination of T.A. and noted T.A. would remain in the LCDC holding cell "pending an open bed coming available at the Montana [S]tate [H]ospital at Warm Springs pending the hearing, if necessary." The District Court noted for the record that for the entirety of the hearing T.A. "remained

covered and has not been responding to anything that I have said and not reacted in any way other than just mov[ing] slightly under the covers."

¶5 The District Court held the commitment hearing on June 23, 2020. At that hearing, the State informed the court T.A. refused to leave the protective custody cell at LCDC, was defecating and urinating in the cell, and was assaultive to those who approached her. The State asserted, due to those behaviors, T.A. was not available for personal appearance in the courtroom and she was not available for appearance without jeopardizing both her safety and the safety of others. The State requested permission to proceed with the commitment hearing without T.A. personally present. The District Court noted LCDC had audiovisual equipment which would allow T.A. to appear by video from the LCDC library a short distance away from the protective custody cell, but T.A. refused to leave her cell to appear by video as well. The court then asked if T.A.'s attorney would like to put anything on the record regarding T.A.'s appearance. T.A.'s attorney informed the court "that [T.A.] has not expressed to me a desire to have this hearing proceed without her being physically present; therefore, I cannot so tell the [c]ourt that that's her wish. It is not as she has not expressed it to me. She also has not named a friend. That was reserved at the initial appearance on Friday. She has not communicated any name of a person to me at any point in time." T.A.'s attorney requested the District Court hold the commitment hearing outside of T.A.'s cell, as it did for the initial appearance, and noted that, while T.A. did not participate in the hearing at all, it was counsel's belief T.A. "seemed to be able to hear what was happening."

4

¶6 The District Court denied the request to hold the commitment hearing outside of T.A.'s cell. The court noted T.A. attacked anyone who was not protected from her and had been "forcing her feces and urine through the cell door of the protective custody cell." The court noted the area outside of the cell was an approximately 8-foot by 8-foot room and there were eight people present for the hearing, which would become ten people once detention staff were present, and it would be "impossible for us to maintain social distancing at that level." The District Court then went forward with the commitment hearing without T.A. present, either in person or by video. During the hearing, the court heard testimony from Helena Police Department Detective Randy Robinson and Dr. Crowell. Detective Robinson and Dr. Crowell both testified regarding T.A.'s behaviors. Dr. Crowell testified she believed T.A. suffered from an unspecified psychosis and that she did not agree with T.A.'s previous diagnosis from MSH of malingering for shelter. At the end of the hearing, the District Court granted the State's Petition, found commitment to MSH was the least restrictive treatment, and authorized MSH to administer involuntary medication. The court thereafter issued its written Findings of Fact, Conclusions of Law and Order, which involuntarily committed T.A. to MSH for up to 90 days, on June 25, 2020.

¶7 T.A. appeals. We restate the issue on appeal as follows: whether the District Court denied T.A.'s right to due process by conducting the commitment hearing without her personally present.

¶8 Due process claims in a civil commitment proceeding are subject to plenary review. *In re J.S.*, 2017 MT 214, ¶ 9, 388 Mont. 397, 401 P.3d 197 (citing *In re Mental Health of T.M.*, 2004 MT 221, ¶ 7, 322 Mont. 394, 96 P.3d 1147). We review a district court's civil commitment order to determine whether its findings of fact are clearly erroneous and whether its conclusions of law are correct. *In re F.S.*, 2021 MT 262, ¶ 6, 406 Mont. 1, 496 P.3d 958 (citing *In re B.H.*, 2018 MT 282, ¶ 9, 393 Mont. 352, 430 P.3d 1006). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that a mistake has been made after reviewing the entire record. *In re A.M.*, 2014 MT 221, ¶ 8, 376 Mont. 226, 332 P.3d 263.

¶9 At the outset, we note the facts of this case are unique and unlikely to recur. The commitment hearing at issue took place in June of 2020, just over three months after the World Health Organization declared COVID-19 a pandemic, and several months before COVID-19 vaccines became publicly available. At the time, strict adherence to social distancing remained one of the public's greatest tools for avoiding the spread of COVID-19. With this in mind, we turn to the contentions of the parties. T.A. asserts her due process rights were violated when the District Court held the June 23, 2020 commitment hearing without her personally present. T.A. accurately recounts the statutory waiver provisions and notes neither T.A. nor her attorney waived her right to be present at the commitment hearing. The State asserts T.A. waived her right to be present due to her conduct, and, additionally, has waived her claim by failing to object below.

¶10 Before we reach the ultimate due process question, we first address the State's argument T.A. waived her right to appeal because T.A.'s attorney "did not object to T.A.'s absence and thus failed to preserve her claim." We reject the State's contention in this regard. While T.A.'s attorney did not say the word "object," she informed the District Court T.A. had not expressed a desire to waive her personal appearance at the hearing; had not communicated the name of a friend, who could, with the concurrence of T.A.'s attorney, be able to waive T.A.'s appearance; and requested the hearing be moved to outside of T.A.'s jail cell so T.A. would be able to hear the proceedings. On this record, it is clear T.A.'s claim regarding her personal appearance at the commitment hearing was preserved below.

¶11 Civil commitments in Montana are governed by Title 53, chapter 21, MCA. Montana's civil commitment statutes provide for the waiver of rights for a person facing civil commitment:

> (1) A person may waive the person's rights, or if the person is not capable of making an intentional and knowing decision, these rights may be waived by the person's counsel and friend of respondent, if a friend of respondent is appointed, acting together if a record is made of the reasons for the waiver. The right to counsel may not be waived. The right to treatment provided for in this part may not be waived.
>
> (2) The right of the respondent to be physically present at a hearing may also be waived by the respondent's attorney and the friend of respondent with the concurrence of the professional person and the judge upon a finding supported by facts that:
>
> (a)

(i) the presence of the respondent at the hearing would be likely to seriously adversely affect the respondent's mental condition; and

(ii) an alternative location for the hearing in surroundings familiar to the respondent would not prevent the adverse effects on the respondent's mental condition; or

(b) the respondent has voluntarily expressed a desire to waive the respondent's presence at the hearing.

Section 53-21-119, MCA. We require strict adherence to the statutory scheme governing involuntary commitment due to the critical importance of the constitutional rights at stake. *In re R.W.K.*, 2013 MT 54, ¶ 18, 369 Mont. 193, 297 P.3d 318 (citations omitted).

¶12    Pursuant to § 53-21-119(1), MCA, T.A. could have validly waived her rights in two ways: (1) if T.A. was capable of making an intentional and knowing decision, T.A. could have waived her own rights; or (2) if T.A. was not capable of making an intentional and knowing decision, those rights may be waived by T.A.'s counsel and appointed friend acting together if a record was made of the reasons for the waiver. *In re R.W.K.*, ¶ 21. As T.A. refused to answer her attorney's questions regarding a potential friend, no friend was appointed in this case, meaning only T.A. could waive her rights under the commitment statutes. When the District Court held the initial appearance on the State's petition outside of T.A.'s cell, T.A. stayed under the covers and did not speak or react in any way to the proceedings happening outside. She did not speak, and did not affirmatively waive her right to be present at the commitment hearing, during the initial appearance.

¶13    The State asserts T.A.'s conduct—refusing to leave her cell and attacking anyone who approached her—waived T.A.'s right to be physically present at the commitment

8

hearing. In support of this waiver by conduct argument, the State cites to our decision in *In re Mental Health of L.K.*, 2008 MT 169, 343 Mont. 366, 184 P.3d 353 and the United States Supreme Court's decision in *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057 (1970). In *In re Mental Health of L.K.*, we were called upon to determine if L.K.'s right to due process was violated when she appeared by video from MSH in Warm Springs for her commitment hearing and the district court, after warning L.K. her microphone would be muted if she continued to interrupt the proceedings, muted L.K.'s microphone. *In re Mental Health of L.K.*, ¶¶ 12-15. We quoted from *Illinois v. Allen*, which held "'that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.'" *In re Mental Health of L.K.*, ¶ 32 (quoting *Allen*, 397 U.S. at 343, 90 S. Ct. at 1060-61). We ultimately determined the district court did not violate L.K.'s due process rights by muting her microphone. *In re Mental Health of L.K.*, ¶ 33.

¶14 Under normal circumstances, the State's waiver by conduct argument would necessarily fail, because T.A. was neither warned by the District Court she would waive her right to be present if her behavior continued nor appeared in the courtroom and was disruptive as would be required by *Allen*. These conversations simply never happened because T.A. refused to leave her protective custody cell, and it is not necessary for a respondent to "be required to attend the proceeding against her will." *In re P.A.C.*, 2013

MT 84, ¶ 15, 369 Mont. 407, 298 P.3d 1166. T.A. had a months-long history of attacking anyone who attempted to get her out of her protective custody cell, and it is clear only force could have brought her physically into the courtroom where she could have been warned by the District Court that disruption may forfeit her right to appear. Still, under different circumstances, the District Court could have fashioned a way for T.A. to be personally present, such as by holding the hearing outside of the protective custody cell as it did during the initial appearance.

¶15 "The core of due process 'emphasizes fairness between the State and the individual dealing with the State.'" *In re S.M.*, 2017 MT 244, ¶ 26, 389 Mont. 28, 403 P.3d 324 (quoting *Evitts v. Lucey*, 469 U.S. 387, 405, 105 S. Ct. 830, 841 (1985)). The State has a substantial interest in preserving the integrity, fairness, and accuracy of civil commitment proceedings. *In re S.M.*, ¶ 30. Ultimately, regarding due process concerns in civil commitment cases, "the State has an important interest in seeing that proceedings lead to fair and accurate outcomes." *In re S.M.*, ¶ 26. "[N]ot all errors of state law amount to deprivation of procedural due process; rather, we employ a flexible balancing test to determine whether a particular safeguard is required in a specific circumstance." *In re N.A.*, 2013 MT 255, ¶ 23, 371 Mont. 531, 309 P.3d 27. "In civil commitment proceedings, this Court examines procedural due process by weighing the risk of depriving an individual's liberty against the probable value of the procedure in question." *In re N.A.*, ¶ 23 (citing *In re E.T.*, 2008 MT 299, ¶¶ 27-29, 37, 345 Mont. 497, 191 P.3d 470). "When foregoing a procedure does not cause substantial prejudice to a party, the error is *de*

*minimus* [sic] and does not affect an individual's liberty interest." *In re N.A.*, ¶ 23 (citing *In re O.R.B.*, 2008 MT 301, ¶ 30, 345 Mont. 516, 191 P.3d 482).

¶16    Due to the increased number of people involved at the commitment hearing (as opposed to the initial hearing), the option to hold the hearing outside of T.A.'s protective custody cell was not available in June of 2020 due to the COVID-19 pandemic and the attendant required social distancing measures.  In addition, the District Court had been informed T.A. had begun forcing her feces and urine through the cell door, which would further complicate any attempted hearing outside of her cell and present increased safety risks.  The District Court attempted to accommodate T.A.'s refusal to leave her cell by performing the initial appearance outside the cell, but it was simply not possible to pack ten people in an 8-foot by 8-foot room for the commitment hearing due to the COVID-19 pandemic.  At the time T.A.'s commitment hearing happened, the district courts of this state were operating in a "fluid situation . . . [which] require[d] a great deal of flexibility" due to the COVID-19 pandemic and were repeatedly offered guidance by this Court to use remote-hearing or telephonic hearings for cases and reminded a "minimum of six feet between individuals must be maintained" for public safety.  Memorandum from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana District Court Judges et al. (May 22, 2020) (https://perma.cc/F79T-HY2N); *see also* Memorandum from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana District Court Judges et al. (April 27, 2020) (https://perma.cc/S3C9-WEGK).  With T.A. refusing to leave her cell to appear either in person or by video from the LCDC library, and with the area outside of

her cell far too small to accommodate six feet of separation between the ten individuals present, the District Court required flexibility in conducting the commitment hearing. Weighing the potential loss of T.A.'s liberty by a commitment to MSH, when she was already incarcerated at LCDC and a danger to herself and others, with the danger which would have been imposed by cramming ten people into an 8-foot by 8-foot room at the height of a pandemic in June 2020, *In re N.A.*, ¶ 23, we reservedly find the District Court's procedure did not violate T.A.'s right to due process. While the right to appear is a cornerstone of our judicial system, T.A.'s non-appearance in this particular case, under these very unusual and very rare circumstances, did not cause her substantial prejudice and as such, was not a due process violation. *In re N.A.*, ¶ 23. Dr. Crowell testified T.A. spent between 20 and 22 hours per day hidden under the covers in her cell, and the District Court observed the same—T.A. hidden under the covers and not responsive to those outside— when it conducted the initial appearance outside of T.A.'s cell. Under these circumstances, it was unnecessary for the District Court to risk COVID exposure for ten people by holding the commitment hearing outside of T.A.'s cell as the testimony revealed T.A. was suffering from severe mental illness and was a danger to herself and others. "The standard of proof in a civil commitment proceeding is clear and convincing evidence." *In re J.S.*, ¶ 24. The District Court had not only clear and convincing evidence, but evidence beyond a reasonable doubt, T.A. needed to be committed to MSH. Absent the COVID situation, the District Court would still have been required to fashion a way for T.A. to appear for the commitment hearing as she did not validly waive her personal appearance, but under the

circumstances as they existed at the time, its deviation from statutory procedures regarding personal appearance was not a due process violation.[1]

¶17    In addition, the District Court had other statutory concerns set forth by the civil commitment statutes to meet. After the initial appearance on the petition was completed, the District Court was required to hold the commitment hearing within five days. Section 53-21-122(2)(a), MCA. At the time of the June 23, 2020 commitment hearing, T.A. was refusing to leave the protective custody cell, assaulting those who attempted to enter the cell, and the small area outside of that cell utilized by the District Court for the initial appearance could not accommodate the number of people present for the commitment hearing. Continuing the hearing to fashion a solution to allow T.A.'s personal presence with these complications present could not be done with the District Court still meeting the five-day requirement imposed by § 53-21-122(2)(a), MCA. It would have been unreasonable to send LCDC staff to face assault and force T.A. out of her protective custody cell when she was refusing to leave and it was physically not possible to hold the

---

[1] It is also noted, at the initial appearance the District Court should have considered appointing a "friend of respondent"—defined as "any person willing and able to assist a person . . . alleged to be suffering from a mental disorder and requiring commitment"—even though T.A. had not provided the name of a friend. Section 53-21-102(8), MCA. There is no preclusion on a district court to appoint a friend of respondent when the respondent has not identified a person to serve as such. This would have permitted the friend to consult with T.A.'s counsel to determine the appropriateness of seeking waiver of T.A.'s personal appearance at the commitment hearing. Although such did not occur here, we recognize the very difficult and unusual COVID situation the District Court was faced with together with the very severe mental health symptoms T.A. was exhibiting and, in light of such, do not fault the District Court for the decision it made in that moment.

hearing outside of the protective custody cell while maintaining the required social distancing necessary at that point in the COVID-19 pandemic. *See In re S.D.*, 2018 MT 176, ¶ 28 n.2, 392 Mont. 116, 422 P.3d 122 (McKinnon, J., dissenting).

¶18 "The requirement of 'due process' is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162, 71 S. Ct. 624, 643 (1951) (Frankfurter, J., concurring). The time, place, and circumstances of this case allowed for the procedural variation the District Court took here. T.A. would not leave her protective custody cell, attacked anyone who came into personal contact with her, and the area outside of her cell was far too small to allow for social distancing during the COVID-19 pandemic. Had any of these circumstances been different, the District Court would have been in error by not holding the commitment hearing with T.A. personally present.

¶19 Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

14