FILED

08/30/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0156

DA 16-0156

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 214

IN THE MATTER OF:

J.S.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. CDI 16-21
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Kristen L. Peterson, James Reavis (argued), Assistant Appellate Defenders, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar (argued), Assistant Attorney General, Helena, Montana

            Leo J. Gallagher, Lewis and Clark County Attorney, Helena, Montana

      For Amicus Curiae:

            Beth Brenneman (argued), Roberta R. Zenker, Disability Rights Montana, Helena, Montana

            Alex Rate, Legal Director ACLU of Montana, Missoula, Montana

                    Argued and Submitted: June 28, 2017
                             Decided: August 30, 2017

Filed:

                             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 J.S. challenges her involuntary commitment to the Montana State Hospital (MSH) ordered by the First Judicial District Court, Lewis and Clark County. The only issue J.S. raises on appeal is whether she was denied the effective assistance of counsel. We address J.S.'s claim of ineffective assistance of counsel and, in doing so, reconsider by what standard such a claim should be measured. We affirm J.S.'s commitment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 J.S. suffers from bipolar disorder. On January 30, 2016, an ambulance transported J.S. to St. Peter's Hospital after she was found in the middle of Lincoln Road in Helena. J.S. had been "clipped" by a car and hit by the car's mirror. She sustained several cuts and abrasions. Because she was extremely psychotic and delusional, the emergency room physician contacted Western Montana Mental Health Center (WMMHC) to do an evaluation. Kim Waples (Waples), a mental health professional with WMMHC, conducted an evaluation and concluded that J.S. was in need of emergency detention. Waples contacted the County Attorney who filed a petition for J.S.'s involuntary commitment. Pending trial on the State's petition, J.S. was detained at MSH and reassessed. Based on the reassessment, the State dismissed its petition and J.S. was discharged to the community.

¶3 Several days later, on February 9, 2016, J.S. called 911 requesting help to get to the Center for Mental Health. An officer transported J.S. there, but the Center for Mental Health informed J.S. that she could not be seen for two days. The officer was concerned about J.S. and asked her to go to the hospital, which J.S. agreed to do. While at the

2

hospital, emergency room staff contacted Kristina Gillespie (Gillespie), a mental health professional, because J.S. was unable to communicate due to her extreme level of psychosis and delusional thinking. She was paranoid, irritable, and unable to consent to voluntary treatment. Additionally, J.S. had a serious wound on her leg which was not being treated. Based on Gillespie's evaluation, J.S. was detained on an emergency basis at the Journey Home, a local mental health center. The State filed a petition to have J.S. involuntarily committed. Trial was held on February 11, 2016.

¶4 Justin Kennedy (Kennedy), a nurse at the Journey Home who has experience with skin and wound issues, treated J.S. Kennedy testified J.S. had two "dime-sized" open areas which were 70 percent necrotic, or dead, tissue. The wound bed was at a high risk of infection, which, if not treated correctly, could lead to loss of J.S's leg or J.S. becoming septic. Treatment of the wound required J.S. to change the dressings twice a day and take two antibiotics, one of which J.S. had to take four times a day and the other two times a day. J.S. would need to maintain supplies, which might be difficult given Kennedy's understanding that J.S. was homeless. Kennedy testified that he explained to J.S. the regimen for changing her dressings and the frequency and need to take her antibiotics; however, when he stepped away for five minutes and returned to reassess whether she understood, J.S. was unable to repeat the regimen to Kennedy. She could not restate the names of the antibiotics or how often she was supposed to take them. She could not state how often she was to change her dressings. Kennedy testified that J.S.'s mental illness was definitely playing a part in her inability to adequately care for her wound.

¶5     Waples conducted J.S.'s evaluation in preparation for trial. In Waples's report to the court she indicated that J.S. was highly agitated, aggressive, and "postur[ing] towards another resident in the [emergency detention] unit." J.S. denied any history of mental illness and when asked if she had ever been treated for a mental illness, responded emphatically that she had not.[1] Waples noted an extensive history of mental illness, suicide attempts, and prior commitments. During trial, Waples testified that J.S. was suffering from unspecified bipolar and related disorder, which could not be stabilized without psychotropic medications. She presented as manic. She was delusional, agitated, and irritable. Her thoughts were disorganized, punctuated by moments of clarity, but then becoming disorganized again. Waples explained that while some people present as delusional all the time, some will have moments of clarity. J.S. was grandiose and had tangential speech. During Waples's evaluation of J.S., J.S. would start to answer questions, but then her thoughts would "derail[]" and her thinking would become disorganized. Waples indicated that J.S. did not believe she had a mental disorder and that such a belief would significantly affect J.S's willingness and ability to seek treatment on her own. According to Waples, a person who is disorganized in her thinking is unable to consistently care for herself. Waples testified it is "hit and miss" and that sometimes J.S. could get appropriate help, but if J.S.'s thoughts were delusional and disorganized, "she might not really be able to connect where to go and what type of help to ask for." Finally, Waples asked J.S. if she knew what kind of care her leg required; J.S. just looked at Waples and shrugged.

_____

[1] More specifically, J.S. stated, "You can shove your bipolar up your ass."

4

¶6 Waples testified that MSH was the least restrictive placement for J.S. because her history showed she does not think she has a mental illness. Waples opined that J.S. would not seek treatment if she did not believe she was ill. Waples testified outpatient community based programs such as the Program for Assertive Community Placement, the Journey Home, or St. Peter's Behavioral Health Unit were not appropriate because they are voluntary and would require J.S. to seek help. Waples testified that J.S. told her she did not need help or need to take psychotropic medications.

¶7 The record indicates that J.S.'s counsel attended Waples's evaluation of J.S. at the Journey Home and also obtained an independent examination from another professional person, Dr. Bowman Smelko (Dr. Smelko). J.S.'s counsel chose not to present testimony from the independent evaluation. On cross-examination of Waples, J.S.'s counsel established many facts in support of her client's position that the petition should be dismissed, including J.S. had called 911 on her own, seeking transportation to the Center for Mental Health; J.S. agreed to go to the hospital with police; J.S. understood the need to take care of her wound; J.S. voluntarily took her medications during her prior detention at MSH; J.S. voluntarily took medication to stabilize her acute mental distress while at St. Peter's Hospital prior to transfer to the Journey Home; and J.S. was not responsible for knowing the timing of her medications when someone else was responsible for giving them to her. J.S.'s counsel argued that the court should dismiss the petition because J.S. had sought help when needed and accepted help each time it was offered. J.S.'s counsel vigorously maintained that being homeless and not taking care of medical problems is insufficient for the State to meet its burden to show that a person should be involuntarily

committed.[2]  Counsel also consistently maintained that the State had two burdens to meet: that commitment was necessary and that the commitment must be to the least restrictive placement.  Counsel argued that the State failed to meet each burden and, consequently, the petition should be dismissed.

¶8     The District Court found counsel's argument on behalf of J.S. compelling and expressed its unwillingness to order commitment to MSH simply because a person is homeless and unable to take care of medical needs.  Although the court agreed that J.S. initiated a call for services, the court nonetheless found the State had established J.S.'s mental disorder was interfering with her ability to care for her severe infection.  The court

---

[2]  J.S. argues, and the State concedes, that her counsel incorrectly represented to the court that community placement was not an option, unless the court made findings pursuant to § 53-21-126(1)(d), MCA.  We are unable to conclude, however, that the record establishes such a contention is warranted.  In response to the court's inquiry about where a reference in the code to community placement is located, J.S.'s counsel explained, prior to the court having made any findings pursuant to § 53-21-126, MCA, that the most restrictive placement which may be ordered pursuant to a finding under § 53-21-126(1)(d), MCA, is a commitment to a community facility or program.  J.S.'s counsel again revisited § 53-21-126(1)(d), MCA, during the hearing and indicated a finding pursuant to § 53-21-126(1)(d), MCA, was one of two options that would ensure a community placement of J.S., the other option still remaining was diversion.  J.S.'s counsel continued to explain that even if the State met its burden to show "she meets [the] criteria for commitment [under § 53-21-126, MCA] . . . the statute regarding disposition, [§ 53-21-127, MCA], clearly says that the Court has to then place her in the least restrictive placement. *Just because, even if they met that burden* [under § 53-21-126, MCA] . . . *that doesn't mean . . . you just go straight up to the State Hospital*."  (Emphasis added).

The dialogue between the parties and the court was informal and, importantly, unclear as to which sections of Title 53 were being discussed.  It appeared, at times, the parties were discussing diversion, which is a community placement that suspends the commitment hearing in such a manner that it is unnecessary for the court to make any findings pursuant to § 53-21-126(1)(a)-(d), MCA, a position J.S.'s counsel was advocating.  It also appears the court "blended" the trial with the posttrial disposition hearing, which J.S.'s counsel clearly understood were separate considerations and endeavored to explain to the court the inquiries relevant under § 53-21-126, MCA (trial), and those under § 53-21-127, MCA (posttrial disposition).  Admittedly, J.S.'s counsel was not always clear in her discussion of community placement within the context of diversion, trial, and disposition; however, based on this record, we are unwilling to ascribe to J.S.'s counsel a misrepresentation of the law to the effect that a community placement was not an option if the court made findings pursuant to § 53-21-126(1)(a)-(c), MCA.  Furthermore, even were we to conclude that J.S.'s counsel made such a misstatement of the law, counsel continued to advocate that the petition should be denied because the State had not met its burden pursuant to § 53-21-126, MCA, and that MSH was not the least restrictive placement.

lamented that it had no alternatives other than MSH, having ascertained that the Journey Home was not an option, but determined that J.S's history supported a conclusion that J.S. would not take her medication, which was necessary to stabilize her mental disorder. The court's conclusion was supported by its finding that "the respondent's inability to consent to voluntary medication and her recent track record make her inappropriate for community based placement."

## STANDARD OF REVIEW

¶9 Issues of due process and right to counsel in a civil commitment proceeding are subject to plenary review. *In re Mental Health of T.M.*, 2004 MT 221, ¶ 7, 322 Mont. 394, 96 P.3d 1147. Claims of ineffective assistance of counsel are mixed questions of law and fact that this Court reviews de novo. *In re J.S.W.*, 2013 MT 34, ¶ 26, 369 Mont. 12, 303 P.3d 741.

## DISCUSSION

¶10 J.S. argues that she was denied the effective assistance of counsel during her involuntary commitment proceeding in each of the areas of representation identified in *In re Mental Health of K.G.F.*, 2001 MT 140, 306 Mont. 1, 29 P.3d 485. We take this opportunity to consider our decision in *K.G.F.*; the principles upon which the right to counsel are premised; and the standards enunciated in *K.G.F.* to assess whether a person has been deprived of that right.

¶11 In *K.G.F.* we addressed for the first time whether a respondent in an involuntary commitment proceeding has a constitutional right to effective assistance of counsel and, if so, how such effectiveness should be measured. We recognized that the Legislature

had declared that a purpose of our laws governing the treatment of the seriously mentally ill was to "ensure that due process of law is accorded any person coming under the provisions of this part." Section 53-21-101(4), MCA; *K.G.F.*, ¶ 26. Importantly, in furtherance of that purpose and regarding the right to counsel, the Legislature expressly provided that a person has the right to be represented by counsel, § 53-21-115(5), MCA; that a person who is indigent "shall" have counsel from the office of the public defender appointed, § 53-21-116, MCA; and that the right to counsel may not be waived, § 53-21-119(1), MCA. Reading these statutory provisions together, this Court determined that the Legislature intended counsel's representation of a person against whom a petition was filed to play a vital role in affording that person the basic rights of due process of law. *K.G.F.*, ¶¶ 26, 30.

¶12 We also acknowledged in *K.G.F.* that the Legislature had established other due process rights to be afforded persons in civil commitment proceedings. These additional safeguards include the right to a professional person of the person's own choosing, § 53-21-118, MCA; if indigent, the right to have a professional person of the person's own choosing appointed who will be compensated from the public funds of the county where the respondent resides, § 53-21-118, MCA; the right to notice reasonably in advance of a hearing, § 53-21-115(1), MCA; the right to be present and to present evidence and witnesses, § 53-21-115(2), MCA; the right to know in advance the names and addresses of witnesses, § 53-21-115(3), MCA; the right to cross-examine witnesses, § 53-21-115(4), MCA; the right to remain silent, § 53-21-115(6), MCA; the right to proceed in accordance with the rules of evidence, § 53-21-115(7), MCA; the right to be

8

dressed in the person's own clothes, § 53-21-115(10), MCA; the right to refuse medication prior to a hearing, unless it is lifesaving, § 53-21-115(11), MCA; and the right to voluntarily take necessary medications prior to any hearing, § 53-21-115(12). These rights are "[i]n addition to any other rights that may be guaranteed by the constitution of the United States and of this state . . . ." Section 53-21-115, MCA.

¶13 We also noted in *K.G.F.* that the rights afforded a person in a civil commitment proceeding correspond to many "criminal" due process rights. *See K.G.F.*, ¶ 33 ("[I]n numerous respects the procedural due process rights of an involuntary commitment patient-respondent are identical to those afforded an accused criminal defendant . . . .") Although a civil commitment proceeding is not criminal, it nonetheless involves important individual interests, not at risk in a usual civil case. Here, statutory protections under Title 53, chapter 21, MCA, were established by the Legislature "because of the calamitous effect of a commitment . . . ." *In re Shennum*, 210 Mont. 442, 450-51, 684 P.2d 1073, 1078 (1984). *See also Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 1785 (1992) (stating that freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action); *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902 (1976) (stating that due process is "flexible and calls for procedural protections as the particular situation demands"). Thus, the civil commitment statutes provide numerous procedural protections akin to those in a criminal prosecution, and which are not otherwise afforded a party in a civil proceeding.

¶14 In *K.G.F.*, this Court explained that "where a state statute affords an individual subject to involuntary commitment with the right to counsel, the legislature could not

9

have intended that counsel could be prejudicially ineffective." *K.G.F.*, ¶ 30. The Court concluded that the statutory right to counsel under Title 53, chapter 21, MCA, provides an individual subject to an involuntary commitment proceeding the right to *effective* assistance of counsel. "In turn, this right affords the individual with the right to raise the allegation of ineffective assistance of counsel in challenging a commitment order." *K.G.F.*, ¶ 31. The Court's conclusion that the statutory right of counsel could not be realized unless it was the right to effective assistance of counsel was sound and remains well-reasoned. We continue to endorse such a conclusion and its underlying rationale.

¶15 In *K.G.F.* we also recognized that the statutory right to counsel "explicitly and implicitly garner protection under both the federal and the Montana constitutions." *K.G.F.*, ¶ 27. Importantly, and in our judgment correctly, *K.G.F.* rejected the notion that the right to counsel flows from the Sixth Amendment to the United States Constitution or Article II, Section 24 of the Montana Constitution, both of which expressly provide that the accused in a criminal prosecution shall have the assistance of counsel. *K.G.F.*, ¶¶ 27-28. A respondent is neither accused nor charged with a crime; the proceeding against a respondent is civil, attendant with the rules of civil procedure; and a civil commitment is not pursued for the purpose of penalizing the respondent, but rather for the purpose of ensuring the safety and treatment of the respondent. In *K.G.F.* we concluded that the right to counsel derived from Montana's Due Process Clause contained in Article II, Section 17 ("No person shall be deprived of life, liberty, or property without due process of law."); but was also constitutionally premised upon Article II, Section 4 ("The dignity of the human being is inviolable . . . ") and Article II,

10

Section 10 ("The right of individual privacy is essential . . . and shall not be infringed without the showing of a compelling state interest."). We similarly conclude that the right to effective assistance of counsel in civil commitment proceedings is premised upon the Fourteenth Amendment to the federal Constitution and Article II, Sections 17, 4, and 10 of Montana's Constitution. However, while we recognize that the right to dignity and privacy are rooted in our civil commitment statutes and jurisprudence, to the extent we are assessing the performance of counsel and counsel's role in ensuring a fair trial, our inquiry is necessarily focused on principles of due process. The measure of counsel's effectiveness in protecting the guarantee of a fair trial occurs through the Due Process Clauses of the federal and state Constitutions.

¶16    Those courts that have recognized the right to effective assistance of counsel in involuntary commitment proceedings have premised the right on each particular state statute providing for counsel, as well as due process requirements of both federal and state Constitutions. All courts recognizing a right to counsel in civil commitment proceedings have drawn on Sixth Amendment precedent established by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), and its progeny, to inform the due process inquiry and determine whether counsel has acted effectively in protecting the guarantee of a fair trial. In *K.G.F.*, however, we rejected the standard enunciated in *Strickland* concluding that it "simply does not go far enough to protect the liberty interests of individuals . . . who may or may not have broken any law, but who, upon the expiration of a 90-day commitment, must indefinitely bear the badge of inferiority of a once 'involuntarily committed' person with a proven mental disorder." *K.G.F.*, ¶ 33. In

11

*K.G.F.* the Court concluded "our legal system of judges, lawyers, and clinicians has seemingly lost its way in vigilantly protecting the fundamental rights of such individuals," *K.G.F.*, ¶ 42, and determined there was an "obvious systematic failure of the involuntary civil commitment hearing process itself." *K.G.F.*, ¶ 49. The Court stated its "aim" was "on the failure of the system as a whole, one that through the ordinary course of the efficient administration of a legal process threatens to supplant an individual's due process rights . . . ." *K.G.F.*, ¶ 49. The Court rejected *Strickland's* presumption of reasonable professional assistance because such a presumption was flawed in a proceeding that "routinely accepts--and even requires--an unreasonably low standard of legal assistance and generally disdains zealous, adversarial confrontation." *K.G.F.*, ¶ 35.

¶17 Although the Legislature had already set forth numerous procedural safeguards, which effectively distinguished civil commitment proceedings from usual civil cases, in *K.G.F.* this Court nonetheless "enhance[d]" these statutory protections by "adopt[ing] certain portions" of the National Center for State Courts' Guidelines for Involuntary Civil Commitment. *K.G.F.*, ¶ 70. We identified five "critical areas" and established specific tasks for counsel to undertake in order to effectively represent a client. Generally, those areas are described as follows: (1) there must be an immediate appointment of competent counsel with specialized training or supervised on-the-job training in the duties, skills, and ethics of representing civil commitment respondents, *K.G.F.*, ¶ 71; (2) specific tasks required of counsel during the initial investigation were set forth by the Court, *K.G.F.*, ¶¶ 74-75; (3) specific tasks and inquiries related to the client interview and how it was to

be conducted were established by the Court, *K.G.F.*, ¶¶ 77-80; (4) the right of the patient to have counsel present during the evaluation by the professional person and the right to remain silent were explained, *K.G.F.*, ¶¶ 81-83; and (5) the Court set forth numerous requirements concerning counsel's vigorous advocacy, establishing a presumption that the client wishes not to be involuntarily committed, *K.G.F.*, ¶¶ 84-89.

¶18     Upon thorough consideration, we are convinced that many of the circumstances which impelled this Court to reject *Strickland*, have proven unfounded. Our reasons are several. First, the record frequently will not contain the details of counsel's training and qualifications, or discussions with the respondent. The record similarly will not contain evidence of the attorney's investigations or strategy. Thus, evidence pertaining to many of the "critical areas" of representation identified in *K.G.F.* is not susceptible to direct review on a challenge to an involuntary commitment. Second, we reject that there is "an unreasonably low standard of legal assistance" provided respondents in civil commitment proceedings. We have found little evidence of such in the numerous involuntary commitment proceedings reviewed by this Court since *K.G.F.* Third, civil commitment proceedings were contemplated by the Legislature to move quickly because respondents against whom a petition has been filed have not yet been found to meet the criteria for an involuntary commitment and the trial may result in dismissal of the petition, an outcome respondent's counsel should not seek to delay. If the respondent is in need of treatment sufficient to meet the criteria for commitment then detention in a temporary facility without treatment exacerbates the patient's already acute mental health crisis. Finally, strict compliance with Montana's civil commitment statutes has always been required,

13

even when there is no allegation counsel was performing ineffectively. Regardless of counsel's performance, a commitment can be reversed based on a failure to strictly adhere to the statute; reevaluating the standard by which effectiveness of counsel is assessed, therefore, does not impugn our jurisprudence requiring strict adherence to civil commitment statutes.[3]

¶19 We affirm our conclusion in *K.G.F.* that the Sixth Amendment and Article II, Section 24 of Montana's Constitution do not apply to civil commitment proceedings. We also affirm that the right to the effective assistance of counsel in civil commitment proceedings is grounded, not only in Montana's express statutes providing for the right to counsel, but also in the Due Process Clause of the United States Constitution and Montana's Constitution, Article II, Section 17 ("No person shall be deprived of life, liberty, or property without due process of law."); Article II, Section 4 ("The dignity of the human being is inviolable."); and Article II, Section 10 ("The right of privacy is essential to the well-being of a free society and shall not be infringed . . . ."). We reject, however, the premises upon which the Court jettisoned *Strickland* and its progeny and, in its place, adopted a formalistic approach mandating "deliberate steps counsel should take to effectively protect his or her client's best interests . . . and ensure that the client receives a formal and fair adversarial hearing . . . ." *K.G.F.*, ¶ 64. Accordingly, while we affirm that portion of *K.G.F.* establishing the statutory and constitutional basis for the right to effective assistance of counsel in civil commitment proceedings, we overrule the

---

[3] We have never held, however, that *de minimus* errors which do not result in prejudice to the respondent will serve as a basis for reversal. *See In re M.K.S.*, 2015 MT 146, ¶¶ 12-23, 379 Mont. 293, 350 P.3d 27 (declining to apply plain error doctrine to a statutory violation when respondent was not prejudiced).

measure or standard enunciated in *K.G.F.* for assessing whether a person has been deprived of that right. Some examination of *Strickland*—the standard by which effectiveness of counsel is universally measured by other states in civil commitment proceedings—is necessary.

¶20 In *Strickland*, the Supreme Court "recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." 466 U.S. at 684, 104 S. Ct. at 2063. However, the "guarantees [of] a fair trial [occur] through the Due Process Clauses" which are informed by "the several provisions of the Sixth Amendment, including the Counsel Clause . . . ." *Strickland*, 466 U.S. at 684-85, 104 S. Ct. at 2063. The Sixth Amendment's Counsel Clause thus informs the due process inquiry by advising that "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."[4] *Strickland*, 466 U.S. at 685, 104 S. Ct. at 2063. Based on principles of due process, the Supreme Court recognized that the right to the assistance of counsel "envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685, 104 S. Ct. at 2063. Hence, the Sixth Amendment informs the due process inquiry and defines the "basic elements of the fair

---

[4] The Counsel Clause of the Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. Amend. VI.

trial." *Strickland*, 466 U.S. at 685, 104 S. Ct. at 2063. "In giving meaning to the requirement [of effective assistance of counsel], however, we must take its purpose—to ensure a fair trial—as the guide." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064. Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064.

¶21 The Supreme Court determined that "specific guidelines are not appropriate." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The right to effective assistance of counsel "relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process . . . ." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064-65. "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. As explained in *Strickland*:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions . . . . Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

466 U.S. at 688-89, 104 S. Ct. at 2065.

16

¶22 In order to prevail on an ineffectiveness claim under *Strickland*, a defendant must establish: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense, depriving the defendant of a fair trial. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. Moreover, judicial scrutiny of attorney performance must be "highly deferential" since it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . [or] for a court . . . to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. In order to fairly assess attorney performance, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Because of the countless ways to provide effective representation and the difficulties inherent in eliminating the distorting effects of hindsight, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

¶23 *Strickland* thus explains that the Sixth Amendment right to counsel is needed in order to protect the fundamental right to a fair trial guaranteed by the Due Process Clause. In *Strickland*, the Sixth Amendment, including the Counsel Clause, defined the basic elements of the fair trial in a criminal prosecution. 466 U.S. at 684-85, 104 S. Ct. at 2063. Importantly, the interests of a criminal defendant "are of such magnitude that

historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 1808 (1979). This is accomplished under the Due Process Clause by requiring the State to prove guilt of an accused beyond a reasonable doubt. *Addington*, 441 U.S. at 423-24, 99 S. Ct. at 1808; *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 1076 (1970) (Harlan, J., concurring).[5]

¶24 "In a civil commitment state power is not exercised in a punitive sense." *Addington*, 441 U.S. at 428, 99 S. Ct. at 1810; *K.G.F.*, ¶ 63. While counsel has an adversarial role to play in the proceeding, "the legislated involuntary commitment process must, as a matter of public policy, strive to maintain the 'therapeutic influence' of the legal system on the individual." *K.G.F.*, ¶ 63 (citation omitted). There is no dispute that a civil commitment constitutes a significant deprivation of liberty, often involving the potential for compelled medication, which is among the historic liberties protected by the Due Process Clause. *Vitek v. Jones*, 445 U.S. 480, 492, 100 S. Ct. 1254, 1263 (1980) (citation omitted). Moreover, "an erroneous commitment is sometimes as undesirable as

_____

[5]

> The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of fact of all the essential elements of guilt." Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does reflect a profound judgment about the way in which law should be enforced and justice administered.

*In re Winship*, 397 U.S. at 361-62, 90 S. Ct. at 1071 (citations omitted).

an erroneous conviction." *Addington*, 441 U.S. at 428, 99 S. Ct. at 1810. Civil commitment proceedings, however, employ an intermediate level or standard of proof—the "clear and convincing" standard—which is frequently invoked to protect important individual interests in civil cases. Montana requires that "physical facts" be proven beyond a reasonable doubt, and that the standard of proof as to all other matters is clear and convincing. Section 53-21-126(2), MCA. Consistent with the burden of proof in areas of medical discipline, Montana's civil commitment statutes require that "the respondent's mental disorder must be proved to a reasonable medical certainty." Section 53-21-126(2), MCA. Therefore, to meet due process demands, the standard of proof in Montana's civil commitment proceeding informs the factfinder that the proof must be greater than the preponderance of the evidence standard; but, with the exception of physical facts, less than the reasonable doubt standard. The standard of proof in a civil commitment proceeding is clear and convincing evidence.

¶25 In consideration of the foregoing, we do not accept the proposition in *K.G.F.* that *Strickland* "simply does not go far enough to protect the liberty interests of individuals" who may be involuntarily committed, *K.G.F.*, ¶ 33, when the *Strickland* standard is sufficient to protect the interests of a criminal defendant which "are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Addington*, 441 U.S. at 423, 99 S. Ct. at 1808. The clear and convincing standard of proof required in a civil commitment is high because of the important individual interests at stake; it is still, however, a lesser standard of proof than

19

in a criminal prosecution. While the liberty interest at stake in a civil commitment proceeding is significant, it is no greater than the liberty interest at stake in criminal cases where *Strickland* applies.

¶26 We also conclude the analysis and standard enunciated in *Strickland* is flexible and will allow professional norms and guidelines to be considered, but not determinative, in evaluating whether counsel's performance was reasonable considering all the circumstances. The "critical areas" of representation identified in *K.G.F.* may be useful and perhaps will provide guidance for determining what is reasonable in the context of prevailing professional norms and circumstances of a particular case. Importantly, we are cognizant that our function, here, is that of a court guided by our Constitution and statutes; not as a professional association, which functions to improve and monitor the quality of its profession based upon input from practitioners in particular fields of expertise. Our purpose is simply to ensure that a respondent has received the effective assistance of counsel designed to protect her guarantee of a fair trial. To that end, just as the Sixth Amendment right to counsel defines the basic elements of a fair trial guaranteed by the Due Process Clause, the procedural safeguards embodied by the Legislature in Title 53, chapter 21, MCA, inform the inquiry as to counsel's primary obligation in civil commitment proceedings. Application of *Strickland* will allow other considerations, as well, which may be relevant under the circumstances and are "[i]n addition to any other rights which may be guaranteed by the constitution of the United States and of this state . . . ." Section 53-21-115, MCA. We further conclude that to fairly assess counsel's performance every effort must be made to eliminate the distorting effects of hindsight

20

and to evaluate counsel's conduct from counsel's perspective at the time. Accordingly, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 671, 104 S. Ct. 2056. We do not find such a presumption inconsistent with the requirement that there be strict compliance with the civil commitment statutes; we have and will continue to require strict compliance to the civil commitment statutes regardless of counsel's performance. Henceforth, *Strickland* will be the standard by which this Court measures the effectiveness of counsel in civil commitment proceedings.

¶27 We turn now to the case at hand. Aside from J.S.'s contention that counsel misapprehended the district court's authority to order a community placement, a contention we cannot fairly draw from the record, J.S. argues that her counsel failed to investigate community placement options or, alternatively, failed to request a continuance of the disposition hearing to allow an adequate investigation into alternatives. First, our review of the record convinces us that J.S.'s counsel was representing her client's wishes by seeking to have the petition *dismissed* with *no* community placement commitment at all. J.S.'s counsel appreciated that it was the State's burden, not J.S.'s, to establish by clear and convincing evidence that there was a need for commitment in the first instance. J.S.'s counsel endeavored to hold the State to its burden. Despite the therapeutic purpose of a commitment proceeding, it nonetheless constitutes an effort by the State to deprive an individual of a significant liberty interest. The burden of proving that a commitment is necessary therefore remains with the State and a respondent has the right to require the State to meet its burden of proof.

¶28    Second, it remained clear that there were no appropriate community placement options for J.S., since she denied having a mental illness and did not believe she needed to take stabilizing medication. Section 53-21-127(3)(b), MCA, does authorize the court to "commit the respondent to a community facility or program or to any appropriate course of treatment . . . as provided in 53-21-149 . . . ." Section 53-21-149, MCA, in turn, provides that "the court may order the following conditions for treatment in a community facility or program . . . including but not limited to following a treatment plan developed pursuant to 53-21-150 . . . ." If a court orders a treatment plan, the chief medical officer or designee of the facility at which the respondent is being treated must submit a treatment plan to the court, which the court may either accept or require a revised treatment plan that is "approved by a mental health professional." Section 53-21-150(2) and (5), MCA. Here, Waples was the only mental health professional who presented medical evidence. Waples did not support treating J.S. in a community facility or program, or recommend a course of treatment as provided in § 53-21-149, MCA. Importantly, J.S.'s counsel secured an expert, Dr. Smelko, who evaluated J.S. and did not testify for J.S., presumably because Dr. Smelko was not disputing the need for treatment of J.S. at MSH. Notwithstanding, Waples's recommendation that commitment to MSH was the least restrictive placement option was clearly supported by the evidence: J.S. was agitated, irritable, and "posturing" towards other residents; J.S. did not believe she had a mental illness, despite having an extensive history of illness and commitments; J.S. did not believe medication to treat her mental illness was necessary; and J.S. had a severe, potentially life-threatening injury, which was

22

not being adequately cared for by J.S. due to her mental illness. It was similarly unnecessary for J.S.'s counsel to request a continuance of the disposition hearing to explore placement options since J.S.'s counsel had already consulted with Dr. Smelko. Unfortunately, J.S. did not believe she had a mental illness and would not accept the need to take stabilizing medication, thus rendering a community placement futile. We conclude J.S.'s counsel was not deficient for failing to present alternatives which clearly were not appropriate, nor is it necessary to remand for a hearing to determine why evidence of alternative placements was not presented.

¶29    J.S. also argues that her counsel failed to object to inadmissible hearsay evidence when Waples testified to background information that J.S. called 911 and voluntarily agreed to go to the emergency room. However, J.S.'s counsel used these facts to argue the petition should be dismissed. J.S. also argues that her counsel's failure to immediately object to inadmissible hearsay evidence Waples provided regarding J.S.'s behavior at the Journey Home, led the court to rely on the inadmissible testimony. The court though overruled the objection and considered it anyway, noting the information was from Waples's report which was the basis for Waples's opinion. The court's ruling on an objection which actually was made, especially in the context of a bench trial, does not establish deficient performance. Further, testimony that J.S. would not be accepted into the Journey Home was in response to a question specifically asked by the court.

¶30    J.S. contends she was denied the right to testify at trial and her right to remain silent during Waples's evaluation, specifically when the State relied upon her refusal to answer Waples's questions about how to take care of her wound. The record does not

23

support J.S.'s argument that J.S. was prevented from testifying or that J.S. wanted to testify because she was frustrated with her counsel's performance. While remand remains an appropriate option under some circumstances, we do not find that those exist here. Regarding the State's reliance on J.S.'s failure to answer Waples's questions about taking care of her wound during Waples's evaluation, § 53-21-115(6), MCA, which provides for the right to remain silent, does not state that the respondent's failure to speak is inadmissible. The statute merely indicates that the respondent may not be forced to testify and otherwise has the right to remain silent. The right to remain silent embodied in § 53-21-115(6), MCA, is a statutory right, which garners no protection under the Fifth Amendment applicable to criminal proceedings.

¶31 We conclude that J.S.'s counsel effectively assisted J.S. in her civil commitment proceeding. J.S.'s counsel held the State to its burden of proof and insisted on dismissal of the petition arguing that a person cannot be committed solely on the basis that they are homeless and have a severe medical condition. J.S.'s counsel cannot be faulted for the lack of available resources and alternatives, due in part to her client's refusal to acknowledge her mental illness and the corresponding need for medication. The testimony established that J.S.'s potentially life-threatening infection was exacerbated by her mental illness; an illness J.S. refused to acknowledge. J.S.'s counsel competently and vigorously argued for J.S. and it is unnecessary to remand for an evidentiary hearing.

## CONCLUSION

¶32 We affirm *K.G.F.* to the extent it recognized a statutory right to effective assistance of counsel and a right to counsel premised upon the federal Due Process

24

Clause and Montana's right of due process contained in Article II, Section 17. We also affirm the conclusion reached in *K.G.F.* that a respondent in a civil commitment proceeding does not have a Sixth Amendment right to counsel. We clarify *K.G.F.* by holding that, while our civil commitment statutes and jurisprudence are rooted in the right to dignity (Article II, Section 4) and right of privacy (Article II, Section 10), the effectiveness of counsel in protecting the guarantee of a fair trial is based on principles of due process. We overrule *K.G.F.* to the extent that it requires a formalistic approach to measure counsel's effectiveness; that "critical areas" of representation must be assessed in measuring counsel's performance; and that it repudiates application of *Strickland* in civil commitment proceedings. The standards and principles enunciated in *Strickland* for measuring the effectiveness of counsel are henceforth to be applied in civil commitment proceedings. Finally, we conclude the statutory rights embedded in Title 53, chapter 21, MCA, inform the inquiry of whether a respondent has received the effective assistance of counsel, although the enumerated statutory safeguards are not exclusive and circumstances of a particular case may dictate other considerations.

¶33 Applying the foregoing to the case *sub judice*, we reject J.S.'s claim that she did not receive the effective assistance of counsel during her commitment proceeding. J.S.'s order of commitment is affirmed.

/S/ LAURIE McKINNON

25

We Concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE