FILED

10/07/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0645

DA 22-0645

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 225

IN THE MATTER OF THE
MENTAL HEALTH OF

T.W.,

     Respondent and Appellant.

APPEAL FROM:   District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DI-22-2
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Kristen L. Peterson (argued), Assistant Appellate Defender, Helena,
Montana

     For Appellee:

          Austin Knudsen, Montana Attorney General, Thad Tudor (argued),
Assistant Attorney General, Helena, Montana

          Marcia J. Boris, Lincoln County Attorney, Jeffrey Zwang, Deputy
County Attorney, Libby, Montana

          Argued and Submitted: April 30, 2025

          Decided: October 7, 2025

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 T.W. appeals the September 26, 2022 order from the Montana Nineteenth Judicial District Court, Lincoln County, committing her, upon jury verdict, to the Montana State Hospital (MSH) for 90 days. We address the following restated issues:

1. *Was the State's second involuntary commitment petition, or evidence underlying its first petition, barred by res judicata or collateral estoppel?*

2. *Did the District Court err by compelling T.W.'s presence at her jury trial via two-way audio-video over T.W.'s objections and waiver of presence?*

We affirm in part and reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 On August 17, 2022, the State petitioned for involuntary commitment of T.W. based on the report of Mavis Vaillancourt, an examining mental health professional, that T.W. was suffering from a mental disorder (severe psychosis) and required commitment for 90 days to MSH. T.W. presented with paranoid delusions, hallucinations, suicidal ideations, and was starving herself. Vaillancourt believed commitment was necessary because T.W. could not meet her basic needs and threatened to harm others.

¶3 At the jury trial on the initial petition, T.W. waived presence due to emotional distress and fears she would become "very upset" during professional person Vaillancourt's testimony. After confirming that the appointed "friend of the respondent" agreed, the court accepted T.W.'s waiver of presence and granted her request to view the proceedings remotely with her video off and audio muted. T.W. was able to communicate with her counsel throughout the proceedings.

¶4 The State presented testimony of four witnesses. Lincoln County Sheriff's office patrol captain Boyd White responded to T.W.'s August 16, 2022 911 call, which resulted in his taking T.W. to the hospital that day based on concerns she was experiencing a mental health crisis and not eating. Nurse Amy Johnson testified that T.W. was emaciated and experiencing hallucinations and paranoia when she arrived with law enforcement at the Libby hospital emergency room. Crisis Response Team (CRT) member Kayla Friss saw T.W. at the hospital and testified T.W. made statements about suicide and that T.W. was a safety risk to herself and her one-year-old child. Professional person Vaillancourt diagnosed T.W. to a reasonable degree of medical certainty with Psychosis NOS (not otherwise specified), and testified that T.W.'s mental disorder, as manifest by hallucinations, delusions, suicidal ideations, and self-starvation, created an imminent threat of harm to herself and others and precluded T.W. from meeting her own basic needs. On Friday, August 26, 2022, the jury returned a verdict finding T.W. suffered from a mental disorder but did not require commitment. The District Court dismissed the State's petition.

¶5 The following Monday, August 29, 2022, the State filed a second involuntary commitment petition based on events transpiring over the weekend after the jury verdict.[1] This time, Vaillancourt reported that T.W. called 911 because she was afraid of her stepfather, who she was staying with, but then ran into the woods before law enforcement arrived. Once located by police, T.W. was hospitalized. She presented as severely

---

[1] The language of the State's August 29, 2022 petition was identical to its August 17, 2022 petition; Vaillancourt's reports were the only difference between the two.

malnourished and would not eat without direction; exhibited severe paranoia, delusions, hallucinations, mania, and lack of insight into her condition; and slept for only one hour all weekend. Vaillancourt believed T.W. was a danger to herself and others and unable to meet her basic needs.

¶6 Before her scheduled jury trial, T.W. filed a motion to dismiss the second petition on the grounds it was barred by res judicata (claim preclusion) and collateral estoppel (issue preclusion). Acknowledging her 911 call "hours after the jury verdict" triggered a new hospitalization, T.W. argued this was not new evidence, but rather, only consistent with the behavior underlying allegations not proved at her first trial. The State did not file a written response, but, on the first day of trial, argued that the August 26, 2022 jury verdict was not a "full and final judgment" on the issue and "a person's condition can decompensate over time," as T.W.'s clearly had. Relying on *In re Mental Health of L.C.B.*, 253 Mont. 1, 830 P.2d 1299 (1992), the District Court denied T.W.'s motion to dismiss.

¶7 Immediately after the court's ruling, T.W.'s counsel notified the court that T.W. wished to waive her right to presence and view the trial over Zoom, like she did, without objection, at her previous trial. This time, the prosecutor objected:

> [A]t the last trial, the video was off. First of all, this respondent has requested a jury trial. There has been no showing that watching this on video is any less detrimental to her mental health than being personally present in the courtroom. The jury should have an opportunity to observe her mental condition. That is exactly what is at issue here.

The court ordered T.W. to confer with her counsel and the appointed friend prior to voir dire. After recess, T.W.'s counsel formally asked to allow T.W. to remotely watch and

4

hear the trial with her video and audio off, as she had at her previous trial, and explained

that:

> [I]f [T.W.] speaks out, if she has any strange . . . reaction to something the attorneys . . . or [the court] . . . or a witness says, . . . that could prejudice the jury in a way that . . . is unfair. . . . [I]t is partially due to [T.W.'s] reactions to the proceedings because of the fear that she has. . . . [S]he is very anxious right now [and] says that she wants to go downstairs to decompress. She doesn't want to be part of these proceedings except in that she wants to view it over video and hear the audio.
>
> . . .
>
> In speaking with the Friend of the Respondent, . . . there's also a concern that there could be a constant disruption. Which I know the court doesn't want. . . . [I]t is going to be inefficient if we have her interjecting throughout. [T.W.] is able to communicate with me by phone; [she] can text me. And I'd like the record to reflect [T.W.] is nodding in agreement as I am saying these things. So this is something that she wants to do. She does not want to be part of this proceeding and wants to waive her appearance.

T.W. added:

> I understand my rights very, very well. . . . [L]ike [my counsel] was saying, . . . I don't want for my personal individual self to be interrupting or giving off any kind of emotions that would be . . . verbally and emotionally abusive or disrupting to anyone else's emotional state. . . . I don't want to interrupt anybody out of talking turn, and it is extremely stressful for me with the situation at hand.
>
> So, as long as my attorney . . . can appropriately defend me and nobody else lies about their position of power, I would very much like to sit down there and only simply listen in and let people observe my behavior because I am not physically abusive toward anyone.

The court accepted T.W.'s waiver of presence and granted her request to watch via Zoom

but ordered that the camera and microphone were to remain on. The court reasoned that:

> even if detrimental, the manner in which somebody comports themselves during the course of these proceedings for the jury to observe is appropriate. They should see that. They can see that. And although they may not be

5

experts in the area of mental health, that's what we are asking them to do by requesting these jury trials, and as the fact finder, that is what they are doing. So those personal observations are important, but I am balancing that with [T.W.'s] desires and stated preferences not to be personally present in the courtroom.

T.W.'s counsel objected a final time, noting that the appointed friend agreed "it would be most appropriate" for T.W. to be on Zoom with the video and audio off.

¶8    After voir dire, the prosecutor commented that T.W. had "been speaking at times but we haven't heard it, . . . [so] I wonder if we can check the audio or make sure that things are working correctly." The court confirmed that T.W. was audible. T.W.'s counsel then objected again:

> Judge, I am going to ask again that [T.W.] be muted. . . . [S]he is willing to waive her appearance that's what she wants to see happen. I think it is a little weird that the County Attorney is asking that she be unmuted so that she can interrupt the proceedings. I question why they want to see that happen. We are trying to promote judicial efficiency. [T.W.] was crying throughout some of the voir dire. . . . I don't see any reason why her microphone needs to be turned on. . . . [A]gain, we are asking that her camera be turned off, that she be muted, and alternatively that she just not be a part of these proceedings at all.

The court answered:

> I granted your request that she appear via video conferencing. And I did so specifically that the camera would be on and that the microphone would be unmuted. . . . [I]t's been unmuted as far as what I can tell. It hasn't been a problem. . . . I can hear what is going on down there. And I think how she reacts to these proceedings is an important element for the jury to consider. It's not done in a vacuum and I think the case law supports that.

At recess during the State's case, T.W.'s counsel again made a record:

> [T]hroughout the proceedings today, I am seeing jurors looking up at the screen. . . . [T.W.], through no fault of her own, she's making noise, she's kind of walking around the room, she's becoming agitated, she's been crying and then she's not crying and then she's crying again. . . . [A]t times she's

6

speaking to someone else in the room. She now has taken all of her belongings out of her brown sack. She's laid them across the floor. She seems to be organizing them. I think at one point she actually was playing music on her phone. She has—she's moving around the room, she's right in front of the camera and then she's back in the back of the room. . . . [I]t's proved to be very distracting, at least to me, and . . . members of the jury are looking, and they are not focusing on the testimony that is coming in, they are looking at what's going on on the screen, which was one of my fears initially.

The court answered:

[T]he record will reflect that [T.W.] has elected not to sit in the chair, that she is reorganizing or folding, or taking care of her personal effects, perhaps inventorying them. She has been active. I haven't heard any music, or noise or anything like that. I think she's being very quiet down there from what I can tell. But certainly she's mobile.

¶9     The record reflects that the District Court muted T.W. during the State's presentation of evidence "to minimize disruption," and muted her again during a recess but unmuted her when the parties reconvened on the record, noting T.W. "seems to have recomposed herself" but, "in the event that it gets to be, again, a distraction or anything, I'll mute it" without "mak[ing] a big announcement." The court also noted T.W. was talking to an officer in the room and that the court "saw her tattoo." During another recess, the court admonished T.W., "don't talk too loud or too much" because "we just don't want it to be distracting."

¶10    Over T.W.'s objection, the State presented evidence about the events prior to T.W.'s August 26, 2022 jury verdict. Captain White testified about the August 16, 2022 911 call leading to T.W.'s hospitalization, providing more detail than at the previous trial. CRT member Friss testified about her interaction with T.W. at the ER on August 16, 2022, in more detail than at the previous trial. Libby ER nurse Johnson described her first

7

interaction with T.W. on August 16, 2022, but also testified about her second interaction with T.W. at the ER on August 26, 2022, where T.W. presented in a similar delusional state.

¶11   The State also presented evidence about events post-verdict underlying the second commitment petition. T.W.'s stepfather testified that T.W. came to stay with him after her release on August 26, 2022, and appeared "very paranoid." T.W. called 911 the next morning, afraid he was going to hurt her, but before police arrived, she ran out the door and away from the house. T.W. was later found and taken by police to the hospital emergency room. Deputy Andrew Smith testified that he responded to T.W.'s 911 call on August 27, 2022, and found her in a paranoid, detached, and panicked state. She initially wanted to go to the hospital, but then refused, changing her mind many times. The State played for the jury approximately 35 minutes of Deputy Smith's body camera footage of his interactions with T.W.

¶12   Nurse Megan Morgan testified that T.W. presented at the hospital on August 28-29, 2022, with paranoia, delusions, insomnia, lack of insight into her condition and was incapable of eating or bathing without frequent redirection. County detention officer Debra Davis-Burrell testified she had transported T.W. during proceedings on the State's initial petition and then sat in with T.W. while she was detained at the hospital over the weekend on August 27-28, 2022. T.W. was erratic, delusional, sleepless, and did not want to eat. Detention officer Rebecca Guerra testified that, over the weekend at the hospital, T.W. exhibited erratic mood swings and delusions, was at times angry, disinterested in food, and not sleeping. Detective Brandon Holzer testified that, when he transported T.W. from

8

MSH to trial, she initially climbed into the trunk of the transport vehicle, was confused and repeatedly asked where they were going, and asked if he was going to rape her.

¶13    Finally, professional person Vaillancourt testified, over T.W.'s objection, about her August 16 and 19, 2022 evaluations of T.W. and consistent with her testimony at T.W.'s first trial. Vaillancourt also evaluated T.W. again on August 27 and September 2, 2022, incident to the State's second commitment petition. At that time, T.W. exhibited "increased" delusions, paranoia, and psychosis; was very confused, difficult to redirect, and "much more agitated"; lacked insight and fixated on her delusions; and remained undernourished and sleepless—i.e., her condition had decompensated since the previous evaluations. Vaillancourt also said T.W. refused medical treatment while at MSH during proceedings on the State's first petition. Based on her review of MSH staff notes, T.W.'s available medical history, and the body camera footage, as well as her personal observations, Vaillancourt opined to a reasonable degree of medical certainty that T.W. suffered from a mental disorder (diagnosed Psychosis NOS) that rendered her unable to meet her own basic needs and a threat to her safety and the safety of others, and that commitment to MSH was necessary.

¶14    In closing argument, the State reminded the jury: "we've seen, we've observed the Respondent during the course of this trial," and insinuated her apparent "inability to stay on task and focus enough to eat is a serious threat to her health and her safety." The jury returned a verdict that T.W. suffered from a mental disorder that caused her to injure herself or others and rendered her unable to meet her own basic needs, requiring involuntary

9

commitment.[2]  On September 26, 2022, the District Court committed T.W. to MSH for 90 days.  Although T.W. has since been discharged, her appeal is not moot.[3]

## STANDARD OF REVIEW

¶15     Montana's involuntary commitment statutory scheme requires strict adherence, "considering the utmost importance of the rights at stake."  *In re S.E.*, 2022 MT 205, ¶ 10, 410 Mont. 345, 519 P.3d 11 (citing *In re S.D.*, 2018 MT 176, ¶ 8, 392 Mont. 116, 422 P.3d 122).  We exercise de novo review when deciding questions of law such as whether the district court correctly interpreted and applied the civil commitment statutes.  *In re N.A.*, 2021 MT 228, ¶ 8, 405 Mont. 277, 495 P.3d 45; *In re G.M.*, 2024 MT 49, ¶ 8, 415 Mont. 399, 544 P.3d 893.

¶16     Res judicata (claim preclusion) and collateral estoppel (issue preclusion) present questions of law we review de novo for correctness.  *Adams v. Two Rivers Apts., LLLP*, 2019 MT 157, ¶ 5, 396 Mont. 315, 444 P.3d 415.  We review evidentiary rulings for an abuse of discretion but review underlying interpretation and application of evidentiary rules for correctness.  *In re T.W.*, 2006 MT 153, ¶ 8, 332 Mont. 454, 139 P.3d 810.

## DISCUSSION

¶17     *1.  Was the State's second involuntary commitment petition, or evidence underlying its first petition, barred by res judicata or collateral estoppel?*

¶18     T.W.'s claim of error on this issue is two-fold:  she contends the District Court erroneously denied her motion to dismiss the State's second commitment petition, and then

---

[2] Though asked to, the jury did not find that T.W. was an imminent threat to herself or others.

[3] *In re Mental Health of W.K.*, 2020 MT 71, ¶ 15, 399 Mont. 337, 460 P.3d 917.

erroneously allowed testimony from Vaillancourt, Captain White, ER Nurse Johnson, and CRT member Friss about events prior to the August 26, 2022 verdict. The State counters that preclusion doctrines do not apply here, and in any event, any erroneous evidentiary rulings were harmless considering the overwhelming post-verdict evidence of T.W.'s mental disorder and need for commitment.

¶19 Res judicata and collateral estoppel are related common law doctrines that "preclude future litigation of a final judgment"—either by relitigating a claim or an issue a party has already had an opportunity to litigate. *Reisbeck v. Farmers Ins. Exch.*, 2020 MT 171, ¶ 13, 400 Mont. 345, 467 P.3d 557; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 65, 345 Mont. 12, 192 P.3d 186. Both claim and issue preclusion require a "final judgment" because their purpose is to prevent piecemeal or collateral attacks on the finality of that judgment. *Reisbeck*, ¶¶ 13-15 (citation omitted).[4]

¶20 In *In re L.C.B.*, we recognized that, given their dynamic and evolving nature, involuntary commitment proceedings are "different than most other civil suits." *In re L.C.B.*, 253 Mont. at 8, 830 P.2d at 1304. There, the respondent argued that a subsequent commitment petition, filed just hours after the court determined commitment was not necessary, was barred by res judicata. After the court's no-commitment

---

[4] Res judicata applies where "(1) the parties or their privies are the same; (2) the subject matter of the present and past actions is the same; (3) the issues are the same and relate to the same subject matter; (4) the capacities of the persons are the same in reference to the subject matter and to the issues between them; and (5) a final judgment has been entered on the merits in the first action." *Adams*, ¶ 8. Collateral estoppel applies where "(1) the identical issue raised was previously decided in a prior adjudication; (2) a final judgment on the merits was issued in the prior adjudication; (3) the party against whom the plea is now asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom preclusion is now asserted was afforded a full and fair opportunity to litigate the issue." *Adams*, ¶ 9.

11

determination, law enforcement officers sought a placement for the respondent, who they did not want to just turn out into the street. *In re L.C.B.*, 253 Mont. at 3-4, 830 P.2d at 1301. A responding mental health professional came to the jail and interviewed the respondent, concluding that he should be committed to MSH for immediate treatment. *In re L.C.B.*, 253 Mont. at 4, 830 P.2d at 1301. Based on this opinion, the State filed a new commitment petition that same afternoon. *In re L.C.B.*, 253 Mont. at 4, 830 P.2d at 1301. The court held an immediate hearing, where the professional person and a law enforcement officer testified. After, the court concluded that the respondent suffered from a mental disorder requiring commitment to MSH. *In re L.C.B.*, 253 Mont. at 4, 830 P.2d at 1301.

¶21 On appeal, we rejected the respondent's claim that res judicata barred the State's second petition, noting that: (1) the lower court had limited the scope of inquiry in the subsequent proceedings to only evidence obtained after the court's first ruling; and (2) preclusion doctrines apply only to determinations that are or are intended to be final. We held:

> A finding at one time that an individual does not suffer from a serious mental illness is not intended to be a final and irrevocable decision on the individual's mental health. The statutes contemplate that the question of whether an individual is seriously mentally ill may be brought at any time as long as the necessary statutory criteria are met.

*In re L.C.B.*, 253 Mont. at 8, 830 P.2d at 1303-04.

¶22 Here, the State's second commitment petition was identical to the first—generally alleging that T.W. suffered from a mental disorder and required commitment, without reference to any specific subsections of § 53-21-126(1), MCA. The only substantive difference was Vaillancourt's supporting report, wherein she recommended commitment

12

based on her evaluation of T.W. while hospitalized over the weekend after the Friday jury verdict.

¶23 As recognized in *In re L.C.B.*, Montana's civil commitment statutes prescribe how involuntary commitment proceedings are to be initiated. Section 53-21-121(2)(c), MCA, requires that the State's petition "must contain the purported facts supporting the allegation of mental disorder, including a report by a mental health professional if any, a statement of the disposition sought pursuant to 53-21-127, and the need for commitment." Section 53-21-127(2), MCA, provides for a disposition upon determination that "the respondent is suffering from a mental disorder and requires commitment within the meaning of this part." Section 53-21-126(1)(a)-(d), MCA, prescribes the four circumstances where "the respondent requires commitment." By their express terms, these provisions limit the form of claims for commitment, but do not limit the number of subsequent petitions the State may bring "as long as the necessary statutory criteria are met." *Accord In re L.C.B.*, 253 Mont. at 8, 830 P.2d at 1303-04. Under T.W.'s theory, res judicata could be applied to bar any subsequent commitment concerning the same respondent, even where the petition complies with the statutory requirements of §§ 53-21-121, -126, and -127, MCA. We cannot extend the common law preclusion doctrine so far as to override the express provisions of the civil commitment statutory scheme.

¶24 Moreover, T.W. admits the effect of the first jury verdict was that she was suffering from a mental disorder but did not require commitment "*as of August 26, 2022.*" The State's second petition did not relitigate that issue. Instead, in its August 29, 2022

13

petition, the State alleged that T.W. was suffering from a mental disorder and required commitment *at that time* based on her August 27, 2022 911 call, subsequent hospitalization, August 29, 2022 mental health evaluation, and professional person Vaillancourt's opinion that T.W.'s mental state was substantially decompensated, as manifest by symptoms more severe than those exhibited just weeks before. Here, the issue the State presented in its second petition was distinct from the issue it presented in the first; therefore, collateral estoppel did not apply.

¶25 We are unpersuaded that our holding in *In re L.C.B.* turned on the lower court's limiting the presentation of evidence on the State's subsequent petition to events transpiring after the court's first ruling. That the court did so was pertinent to answering whether "the issues [were] the same and relate[d] to the same subject matter," an element of res judicata, but was not dispositive of whether res judicata applied. *In re L.C.B.*, 253 Mont. at 8, 830 P.2d at 1303-04.[5] Rather, *In re L.C.B.* countenances against strict application of preclusion doctrines to bar subsequent commitment petitions because "[a] finding at one time" that an individual suffers from a mental disorder requiring involuntary commitment and treatment "is not intended to be a final and irrevocable decision on the individual's mental health," given the fluid, complex, and dynamic nature of mental disorders. *In re L.C.B.*, 253 Mont. at 8, 830 P.2d at 1303-04. Finally, *In re L.C.B.* comports with the civil commitment statutes, which place no limits on the State's filing of

---

[5] Citing *Phelan v. Lee Blain Enters.*, 220 Mont. 296, 716 P.2d 601 (1986) ("unless it clearly appears that the precise question involved in the second case was raised and determined in the former, the judgment is no bar to the second action").

a commitment petition, or subsequent petitions, other than the content requirements of § 53-21-121(2), MCA, and requirement that the petition is supported by probable cause, § 53-21-122(2)(a), MCA.

¶26 After the District Court denied her motion to dismiss, T.W. sought to limit the State's evidence on the need for commitment to that occurring after the prior jury verdict, again on res judicata and collateral estoppel grounds. The District Court declined to preclude evidence of T.W.'s past mental health issues, but noted it would still entertain specific evidentiary objections, as raised. T.W. formally objected to testimony from Vaillancourt, Captain White, ER Nurse Johnson, and CRT member Friss regarding pre-verdict events on res judicata, collateral estoppel, and M. R. Evid. 403 grounds.[6] The District Court overruled T.W.'s objections, noting its previous rulings on claim/issue preclusion. The court also ruled the evidence was relevant and any prejudice did not substantially outweigh its probative value.[7]

¶27 First, and for reasons stated above, res judicata and collateral estoppel were inapplicable to exclude pre-verdict evidence because the State was not relitigating the first commitment petition at the second trial. *Accord Lorang*, ¶¶ 63-78 (it does not follow that, because "certain evidence was relevant in a previous suit," "utilizing the evidence in a subsequent suit leads to re-litigation of claims or issues previously litigated").

---

[6] T.W. also objected to Captain White and Vaillancourt's testimony on M. R. Evid. 404 grounds, though she did not specify whether the testimony was improper character evidence or evidence of prior acts. Regardless, T.W. has abandoned her Rule 404 argument on appeal.

[7] The court did not specifically articulate its reasons for overruling under Rule 403 until T.W.'s objection to Vaillancourt's testimony.

15

¶28 Second, evidence of T.W.'s mental state, condition, and interactions with law enforcement and mental health professionals in mid-August was relevant to Vaillancourt's mental disorder diagnosis and medical opinions regarding the necessity of treatment. *See* § 53-21-126(1), (2), (4), MCA (commitment criteria, evidentiary burdens, and professional person's testimony). Vaillancourt testified that T.W. was suffering from psychosis—manifesting in increased delusions, paranoia, hallucinations, lack of insight, insomnia, and starvation—and required commitment because her disorder rendered her unable to care for her basic needs, in danger of causing further self-harm, and an imminent threat to herself or others. T.W. presented on August 26-29, 2022, in a substantially decompensated state, as compared to Vaillancourt's mid-August evaluations, evidencing the rapidly progressing severity of her symptoms and the urgency for treatment.

¶29 Finally, the District Court correctly concluded that the risk of prejudice did not substantially outweigh the probative value of this evidence. T.W. elicited testimony from seven of the State's eight witnesses about the August 26, 2022 jury verdict finding T.W. suffered from a mental disorder but did not require involuntary commitment.[8] The District Court allowed testimony regarding T.W.'s August 16, 2022 911 call, resulting hospitalization, and interactions with law enforcement and mental health professionals as relevant for the narrow purpose of tending to make Vaillancourt's medical opinions more

---

[8] During Vaillancourt's testimony, the State's last witness, the State introduced without objection a certified copy of the August 26, 2022 jury verdict form. The State offered this exhibit when questioning Vaillancourt about whether she had any authority, after the verdict of no commitment, to further detain T.W. T.W. does not assert that admitting the prior jury verdict form was error or should be reviewed under the plain error doctrine.

or less reliable. The District Court admitted this evidence to provide context or to illustrate specific changes or deterioration in T.W.'s mental condition since the prior proceeding but not to challenge or undermine, implicitly or explicitly, the findings or conclusions reached in the prior commitment proceeding.

¶30 In *In re L.C.B.*, 253 Mont. at 7, 830 P.2d at 1303, we noted that "[s]uppressing relevant evidence in commitment proceedings would defeat the purpose of the proceeding, which is to secure the appropriate treatment for those who need it and are unable, due to their mental condition, to obtain this treatment for themselves." Although applied here in a slightly different context, this rule remains true. We hold the District Court correctly concluded that the State's second commitment petition was not barred by res judicata or collateral estoppel and did not abuse its discretion in allowing the State to present relevant evidence of events and interactions underlying its first commitment petition at T.W.'s trial.

¶31 *2. Did the District Court err by compelling T.W.'s presence at her jury trial via two-way audio-video over T.W.'s objections and waiver of presence?*

¶32 T.W. contends the District Court had no authority to compel her presence at trial via two-way audio-video when she wanted only to watch the trial and communicate with her counsel, but not be seen or heard, due to her fear of disrupting the proceedings. The State counters that T.W. could not demand a jury trial and then "hide" the "symptoms of [her] mental illness" from jury observation, and that allowing respondents to do so "would surely encourage more verdicts like the first one in this case."

¶33 The stated purpose of Montana's civil commitment statutes is to

secure for each person who may be suffering from a mental disorder and requiring commitment the care and treatment suited to the needs of the

17

person and to ensure that the care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity.

Section 53-21-101(1), MCA. "A companion purpose" of these statutes "is to ensure that due process of law is accorded to any person in civil commitment proceedings." *In re S.M.*, 2017 MT 244, ¶ 25, 389 Mont. 28, 403 P.3d 324 (citing § 53-21-101(4), MCA); *accord* §§ 53-21-115 through -118, MCA (respondent's procedural rights). Due process, at its core, requires "fairness between the State and the individual dealing with the State." *In re M.H.W.*, 2025 MT 96, ¶ 18, 421 Mont. 487, 568 P.3d 565.

¶34 We construe the civil commitment statutes to preserve the fundamental constitutional rights of due process, privacy, and individual dignity rooted therein. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶¶ 44-48, 306 Mont. 1, 29 P.3d 485 (the "legislative mandates" of Title 53, chapter 21, MCA, "invoke fundamental rights under our state constitution" (citing § 53-21-101(1), MCA; Mont. Const. art. II, § 4 (right of dignity), § 10 (right of privacy)));[9] *In re J.S.*, 2017 MT 214, ¶¶ 15, 19, 24, 34, 388 Mont. 397, 401 P.3d 197 ("the right to dignity and privacy are rooted in our civil commitment statutes and jurisprudence"); *In re M.H.W.*, ¶ 18 ("Montana law seeks to balance the need for appropriate treatment and the individual's rights and dignity"). An involuntary commitment "is supposed to *help*, not *punish*, the person who may be suffering from a mental disorder." *In re K.G.F.*, ¶ 63; *accord In re J.S.*, ¶ 24 (the State does not exercise its power "in a punitive sense" (citing *Addington v. Texas*, 441 U.S. 418, 428, 99 S. Ct. 1804,

---

[9] *Overruled on other grounds by In re J.S.*, 2017 MT 214, ¶¶ 19, 32, 388 Mont. 397, 401 P.3d 197 (to the extent that it defined the standard for effective assistance of counsel in commitment proceedings as more stringent than the two-part *Strickland* test).

1810 (1979) ("a civil commitment proceeding can in no sense be equated to a criminal prosecution"))).

¶35 A respondent in a civil commitment proceeding has a right to be present at all stages of the proceedings. *See* §§ 53-21-115(2), -116, -122, -126(1), -140(4), MCA. As a procedural safeguard to guarantee this right, "[i]n a trial or hearing on a petition for involuntary commitment, the respondent's presence is required unless waived." *In re S.E.*, ¶ 13 (citing § 53-21-126(1), MCA); *In re F.S.*, 2021 MT 262, ¶ 10, 406 Mont. 1, 496 P.3d 958. Section 53-21-119, MCA, governs the process for a valid waiver:

> (1) A person may waive the person's rights; or, if the person is not capable of making an intentional and knowing decision, these rights may be waived by the person's counsel and friend of respondent, if a friend of respondent is appointed, acting together if a record is made of the reasons for the waiver.
>
> (2) The right of the respondent to be physically present at a hearing may also be waived by the respondent's attorney and the friend of respondent with the concurrence of the professional person and the judge upon a finding supported by facts that:
>
>> (a) (i) the presence of the respondent at the hearing would be likely to seriously adversely affect the respondent's mental condition; and
>>
>> (ii) an alternative location for the hearing in surroundings familiar to the respondent would not prevent the adverse effects on the respondent's mental condition; or
>>
>> (b) the respondent has voluntarily expressed a desire to waive the respondent's presence at the hearing.

In *In re S.D.*, ¶ 11, we distilled § 53-21-119, MCA, to its essence:

> Breaking it down, this statute prescribes that: (1) all statutory rights afforded a respondent in a civil commitment proceeding may be waived, except for the right to counsel and the right to treatment; (2) if capable of doing so, a respondent may waive her own rights; (3) if the respondent is not capable, her rights may be waived only when her counsel and appointed friend agree

19

on the waiver and make a record of it; and (4) if the court holds a hearing and the respondent is not there, the hearing may go forward in her absence only if the respondent's attorney and friend waive her presence, with the concurrence of the designated professional, and the presiding judge makes the factual findings required by subsection (2).

(Internal citations and parentheticals omitted.)

¶36    Under § 53-21-119(1), MCA, "a person who is the subject of the petition for involuntary commitment has the right to waive his or her own rights, which necessarily includes the right to attend any proceedings." *In re P.A.C.*, 2013 MT 84, ¶¶ 8-10, 369 Mont. 407, 298 P.3d 1166.[10]   A respondent may "validly waive[] [the] right to be physically present at [a] commitment hearing" if the respondent is "capable of making an intentional and knowing decision." *In re J.D.L.*, 2023 MT 64, ¶ 10, 412 Mont. 25, 526 P.3d 1096.  Nothing in the civil commitment statutes requires a respondent who intentionally and knowingly waives presence "to attend [a] proceeding against her will." *See In re P.A.C.*, ¶ 15.  In fact, "[e]xhibition of erratic, unpredictable, and unconventional behaviors is precisely the reason the civil commitment statutes provide for a means of waiving a respondent's right to be physically present at a hearing provided procedural safeguards are met." *In re J.D.L.*, ¶ 16.

---

[10] In *In re P.A.C.*, ¶¶ 8-9, we explained that the "first clause" of § 53-21-119(1), MCA, permits the respondent's personal waiver of "[a]ny of" her statutory rights "except for the right to counsel and the right to treatment."  The "second clause" of § 53-21-119(1), MCA, permits a third-party waiver by the respondent's "attorney and friend 'if a record is made of the reasons for the waiver.'" Finally, § 53-21-119(2), MCA, provides that the respondent's right to be "'physically present at a hearing' may 'also' be waived by agreement of" her attorney and friend, "with the concurrence of a professional person and the judge," and only upon a finding that she "would likely be seriously adversely affected by appearing at the hearing" and that "holding the hearing in an alternative location would not prevent those adverse effects."

20

¶37 To further protect the respondent's right to be present during any commitment proceeding, § 53-21-140, MCA, provides that, "when the law requires" a respondent's presence "before a court," presence "may be satisfied" by the respondent's appearance via "two-way electronic audio-video communication," so long as additional procedural safeguards are met. Section 53-21-140(2)-(4), MCA.[11] For example, the audio-video must work in such a way that the respondent, her counsel, and the judge "can see each other simultaneously and converse with each other" and the respondent and her counsel are each present and "can communicate privately." Section 53-21-140(3), MCA. However, the court's discretion to permit a respondent's remote appearance is expressly limited by § 53-21-140(5)(b), MCA, which provides that two-way audio-video "may not be used" if the respondent objects. *In re J.D.L.*, ¶¶ 4-5, 19; *In re N.A.*, ¶¶ 12-13 ("may not" means "mandatory," so § 53-21-140(5)(b) "undoubtedly curtails [the court's] discretion"). Moreover, § 53-21-140, MCA, "does not abrogate" the respondent's rights under §§ 53-21-115, -116, or -117; and the respondent "may waive any of the rights," personally or by third-party, "as provided under 53-21-119." Section 53-21-140(4), MCA.

¶38 At T.W.'s first jury trial, she expressed fears she would become "very upset" during Vaillancourt's testimony and requested to watch the trial remotely. The court, after conferring with counsel and the appointed friend, accepted T.W.'s waiver of presence and permitted her to watch the trial on Zoom with her video off and audio muted.

---

[11] *See, e.g.*, § 53-21-122(2)(a), (3), MCA ("respondent must be brought before the court" with counsel for initial appearance on a commitment petition and advised of rights); § 53-21-126(1), MCA ("respondent must be present" and "represented by counsel at all stages of the trial").

21

¶39 At her second trial, T.W. again intentionally waived presence due to her stated concerns that she would disrupt the proceedings. She wanted to watch the trial and maintain communication with counsel but not be heard. Even though her counsel and the friend believed she should have her audio *and* video turned off, T.W. herself did not oppose "people observ[ing]" that she was "not physically abusive toward anyone." She simply wanted to be muted so they could not hear her emotional outbursts. This time, the State objected to the jury not being able to "observe [T.W.'s] mental condition," which it argued was a fact in issue. The District Court, despite granting T.W.'s request at her first trial, agreed with the State and required her video and audio remain on during the proceedings.

¶40 For the first time, during oral argument on appeal, the State asserted that T.W. could only waive her right to presence pursuant to § 53-21-119(2), MCA, as required by § 53-21-126(1), MCA.[12] Section 53-21-119(2), MCA, as noted above, provides that a respondent's "right to be physically present at a hearing may *also* be waived by" the respondent's attorney, with the agreement and concurrence of the friend, professional person, and judge upon certain factual findings. (Emphasis added.) At both trials, in accepting T.W.'s waiver of presence, the judge required only the agreement of T.W.'s counsel and appointed friend, and did not ask for input from Vaillancourt (the professional person), or render any findings under § 53-21-119(2), MCA. We conclude, therefore, that the District Court accepted T.W.'s waiver of presence, either personally or by third-party, under § 53-21-119(1), MCA. *See In re P.A.C.*, ¶¶ 8-9 (discussing first and second "clauses"

---

[12] Counsel candidly admitted he "really dropped the ball" in briefing the issue.

22

of -119(1), MCA). Importantly, the State does not assert that this was error under § 53-21-126(1), MCA. In fact, the State does not dispute the validity of T.W.'s waiver, but rather, contends that she could not waive her right to presence, watch her trial via Zoom, *and* have her camera and audio turned off, effectively "hiding" herself from the jury.

¶41 The "right to be present" is personal to the respondent and rooted in her rights to appear, offer evidence, present witnesses, and cross-examine adverse witnesses—not in concerns about a jury's ability to observe the respondent's in-court demeanor. *Accord* §§ 53-21-115, -116, -117, -126(3), -140(4), MCA.[13] A respondent is not limited to only two options regarding presence; i.e., she is not required to *either* appear in-person *or* appear via two-way audio-video. She may waive presence altogether, either personally when capable, or via a third party when not. Section 53-21-119, MCA; *In re S.E.*, ¶ 13 ("the respondent's presence is required *unless waived*" (emphasis added)). If she waives presence, the court cannot then compel her appearance by two-way audio-video over her objection and against her will. Section 53-21-140(5)(b), MCA ("two-way" electronic

---

[13] Even the State acknowledges that "reliance on" § 53-21-140, MCA, here is "misplaced" because T.W.'s trial "was not a hearing that included *testimony* by electronic communication." State's Response, p. 26 (emphasis added). We have also said that § 53-21-140, MCA, effects "the Legislature's intent that *witnesses* in involuntary commitment proceedings be observed." *In re S.E.*, ¶¶ 16-17 (discussing "the importance of observing *witnesses*, . . . such as the ability to examine witness credibility and prevent witness coaching," and holding that a witness whose "*testimony* could not be observed by all present . . . contraven[ed]" § 53-21-140(1), MCA (emphasis added)). The primary purpose for jury observation of *the demeanor* of witnesses is to assess their *credibility* and therefore the weight to be given to their testimony when resolving evidentiary conflicts necessary to reach a verdict. *See, e.g.*, *Garding v. State*, 2020 MT 163, ¶ 17, 400 Mont. 296, 466 P.3d 501; *State v. Laird*, 2019 MT 198, ¶ 60, 397 Mont. 29, 447 P.3d 416. A respondent who waives presence is not *a witness* at her commitment proceeding, nor can she be compelled to testify even if present, and there will thus be no need for the jury to observe her demeanor to assess her credibility. *Accord* § 53-21-140(4), MCA (§ 53-21-140, MCA, "does not abrogate a person's rights under 53-21-115, 53-21-116, or 53-21-117").

communication "may not be used" if the respondent "objects"). Here, the District Court had discretion to permit T.W. to appear remotely instead of in-person under § 53-21-140, MCA, a procedural mechanism meant to protect her right to be present. However, facing T.W.'s express waiver of presence, and her simultaneous objection to the two-way audio-video, the court could permit T.W. to observe the proceedings and communicate privately with her counsel, but it could not compel her to appear on screen unmuted.

¶42 We have previously considered § 53-21-140, MCA, in context of claims that remote appearance violated the respondent's right to in-person presence. *See, e.g., In re Mental Health of L.K.*, 2008 MT 169, 343 Mont. 366, 184 P.3d 535; *In re J.D.L.*[14] In *In re L.K.*, ¶¶ 12-14, 28-33, we affirmed the court's decision to periodically mute the respondent, appearing remotely, when she interrupted the proceedings with commentary, argument, and accusatory remarks. In doing so, we relied on the general rule that courts have discretion under trial administration principles "to control" the conduct of trial in the interests of maintaining order, decorum, and dignity in the courtroom. *In re L.K.*, ¶ 32 (citing *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 1061 (1970)); *Allen*, 397 U.S. at 343, 90 S. Ct. at 1061 ([i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country"). *Accord In re J.D.L.*, ¶¶ 12-13 (citing *In re L.K.*, ¶¶ 32-33).

¶43 Here, however, we are faced with the unusual case of a court *inviting* disruption into the courtroom by requiring the jury to experience T.W.'s distracting and erratic behaviors

---

[14] We have also considered whether a witness's remote appearance by two-way audio-video violated the respondent's rights in *In re N.A.* and *In re S.E.*

first-hand based on the stated rationale that doing so was necessary to determine facts at issue. Given the constitutional rights of privacy and dignity underlying Montana's civil commitment scheme, *In re J.S.*, ¶ 15, and the general principle that civil commitment proceedings are meant "to *help*, not *punish*, the person who may be suffering from a mental disorder," *In re K.G.F.*, ¶ 63, we find this rationale troubling. The respondent in a civil commitment proceeding is a human being, not a spectacle, and to preserve her dignity, any "erratic, unpredictable, [or] unconventional behaviors" should not intentionally be put on display. *In re J.D.L.*, ¶ 16. Here, the record shows T.W. undoubtedly disrupted proceedings—including by unpacking and rearranging her belongings, showing off her tattoo, playing music on her phone, walking around the room, sitting on the floor, making noises, crying, and becoming agitated—requiring the court to mute her audio several times. We cannot imagine a scenario where a court would permit this behavior inside the courtroom.

¶44 Moreover, § 53-21-126, MCA, makes no mention of the respondent's *in-court* physical appearance, mannerisms, or conduct as determinative factors in a commitment proceeding. Instead, the fact-finder is to determine whether the respondent (1) "is suffering from a mental disorder," to be established by expert witness testimony "to a reasonable medical certainty," and if so, (2) "commitment is necessary" because, due to the mental disorder, the respondent is substantially unable to meet her own basic needs, has injured herself or others, or there is an imminent threat she will do so. Sections 53-21-126(1)-(4), -102(16), (17), MCA. Indeed, the jurors' repeated visual and auditory exposure to T.W.'s disruptions, agitation, and erratic behavior, via her compelled two-way audio-video

25

appearance, heightened the substantial risk of unfair prejudice.[15] Displaying the emotional and unpredictable behaviors of a respondent in mental distress, unrelated directly to the statutory criteria for commitment, may unduly influence jurors by evoking sympathy, confusion, or bias, rather than careful evaluation of the evidence.

¶45 This right to waive presence, grounded firmly in considerations of due process, privacy, and dignity under Montana law, supersedes any perceived evidentiary interest a jury may have in directly observing a respondent's behavior during commitment proceedings. The Legislature, by providing an explicit and unconditional right of waiver in § 53-21-119, MCA, and an explicit prohibition against compelled remote appearance under § 53-21-140(5)(b), MCA, has prioritized the personal dignity and autonomy of the respondent over any purported evidentiary value derived from involuntary observation. Allowing compelled remote appearance over respondent objection would effectively erode the fundamental rights embodied in these statutory protections, undermining the careful balance struck by the Legislature to protect respondents from unnecessary distress, prejudice, and humiliation.

¶46 To guarantee a respondent's constitutional rights, Montana's civil commitment statutes require a respondent's presence at all proceedings. To secure the right to presence,

---

[15] Just as a criminal defendant's courtroom appearance in shackles may "affect the venire's impartiality in the fact-finding process," broadcasting real-time audio-video of a respondent when she is restless, distressed, or agitated may have a similar detrimental effect. *See State v. Hartsoe*, 2011 MT 188, ¶¶ 22-34, 361 Mont. 305, 258 P.3d 428 ("[v]isible shackling at trial creates a high risk of prejudice because it indicates that the court believes there is a need to separate the defendant from the community at large, creating an inherent danger that the jury may form the impression that the defendant is dangerous or untrustworthy" (citation and punctuation omitted)).

§ 53-21-140, MCA, provides that a respondent may appear via two-way audio-video instead of in-person. However, a respondent may waive presence under § 53-21-119, MCA, and may refuse consent to remote appearance under § 53-21-140(5)(b), MCA. In either case, the respondent cannot be compelled to appear against her will. We hold that the District Court, upon T.W.'s valid waiver of presence and objection to use of two-way audio-video, had no authority to compel her appearance at trial. We therefore reverse the court's September 2022 order committing her to MSH.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA

Chief Justice Cory J. Swanson, concurring and dissenting.

¶47    I concur with the Opinion on Issue 1. On Issue 2, the Court incorrectly interprets the statutes and unnecessarily goes beyond the statutes to create a holding based on Constitutional rights. I therefore respectfully dissent.

¶48    We begin with the relevant statutes. Section 53-21-126, MCA, governs conduct of a trial or hearing on involtory commitment. It begins:

> (1) The respondent *must be present* unless the respondent's presence has been waived as provided in 53-21-119(2), and the respondent must be represented by counsel at all stages of the trial.

27

Section 53-21-126(1), MCA (emphasis added). By its plain language, the section requires the respondent to be present, unless the presence is specifically waived under subsection (2) of the waiver statute discussed below.

¶49 The law permits a hearing on this petition to be conducted via two-way electronic audio-video communication, and allows a respondent to appear in this manner instead of appearing by physical presence. "Whenever the law requires that a respondent or patient . . . be present before a court, this requirement may, *in the discretion of the court*, be satisfied either by the respondent's or patient's physical appearance before the court or by two-way electronic audio-video communication." Section 53-21-140(2), MCA (emphasis added). The court's approval of such an arrangement is within its discretion, and therefore reviewable under the abuse of discretion standard. *See Estate of Frazier v. Miller*, 2021 MT 85, ¶ 12, 404 Mont. 1, 484 P.3d 912 (citing *Jarvenpaa v. Glacier Elec. Co-op., Inc.*, 1998 MT 306, ¶ 12, 292 Mont. 118, 970 P.2d 84) (internal quotations omitted).

¶50 A two-way audio-video hearing is considered a hearing in open court when all the participants can be "observed and heard by all present." Section 53-21-140(1), MCA. The court must ensure the communications allow the respondent, her attorney, and the judge to see each other simultaneously and "converse with each other," but the respondent can also communicate privately with her attorney. Section 53-21-140(2), MCA. By agreeing to an audio-video hearing, the respondent does not waive any other rights and the audio-video

28

hearing cannot be conducted if the respondent or her attorney objects. Section 53-21-140(4), (5), MCA.

¶51 Before addressing the waiver statute, we must first recognize the utility of the audio-video hearing for what it is. It provides an alternative way for the respondent to appear while still fulfilling the mandatory presence requirement for a contested case hearing. In satisfying the respondent's requirement to be present, the statute mandates all the participants—including the respondent—can be seen and heard by the other participants, except if she needs to communicate privately with her attorney.

¶52 If these statutes seem ill-fitting to T.W.'s commitment proceedings, they are. T.W. sought to exclude herself from the courtroom, but did not actually waive her presence. The District Court therefore did what the statutes directed: allowed T.W. to appear by video in a manner that fit the law's mandate. It was an accommodation for T.W.'s benefit. Her complete exclusion from the trial could be allowed by a waiver under § 53-21-119(2), MCA, but she did not request complete exclusion.

¶53 Section 53-21-119, MCA, provides two ways for a respondent to waive her rights, subsection (1) and (2):[1]

> (1) A person may waive the person's rights, or if the person is not capable of making an intentional and knowing decision, these rights may be waived by the person's counsel and friend of respondent, if a friend of respondent is appointed, acting together if a record is made of the reasons for the waiver.

---

[1] The Opinion unnecessarily chastises the State for bringing up subsection (2) for the first time during oral argument. It was not the State that first brought up the statute, but this Dissent's author. When a party "dropped the ball" and did not address an important part of the statute, we risk setting incorrect precedent for future commitments unless we examine all the statutes at issue and harmonize all of the relevant provisions. *See* § 1-2-101, MCA; *Bullock v. Fox*, 2019 MT 50, ¶ 59, 395 Mont. 35, 435 P.3d 1187.

The right to counsel may not be waived. The right to treatment provided for in this part may not be waived.

(2) The right of the respondent to be physically present at a hearing may also be waived by the respondent's attorney and the friend of respondent with the concurrence of the professional person and the judge upon a finding supported by facts that:

(a)(i) the presence of the respondent at the hearing would be likely to seriously adversely affect the respondent's mental condition; and

(ii) an alternative location for the hearing in surroundings familiar to the respondent would not prevent the adverse effects on the respondent's mental condition; or

(b) the respondent has voluntarily expressed a desire to waive the respondent's presence at the hearing.

Section 53-21-119(1), (2), MCA. Properly interpreted, this statute creates two different waivers: a waiver of a person's general rights as defined by subsection (1), and a waiver of the right of the respondent to be physically present under subsection (2).

¶54 We have repeatedly examined the issue of waiving a respondent's presence from an involuntary commitment proceeding, but have not provided a clear and consistent application of the statute. In *In re Mental Health of T.M.*, 2004 MT 221, ¶ 25, 322 Mont. 394, 96 P.3d 1147, we noted the district court was "sympathetic" to a respondent counsel's argument that the attorney and friend could waive the respondent's presence under subsection § 53-21-119(1), MCA. But we did not decide the case on that issue and did not hold the respondent's presence could be waived thereby. *In re T.M.*, ¶ 25.

¶55 In *In re L.K.*, 2009 MT 366, ¶¶ 15–20, 353 Mont. 246, 219 P.3d 1263, we discussed both provisions of the waiver statute, without distinguishing which one applied to the respondent's waiver of presence. We held the district court failed to adequately inquire whether the respondent had waived a right under § 53-21-119, MCA, in any event.

*In re L.K.*, ¶¶ 18–20.  In *In re P.A.C.*, 2013 MT 84, ¶ 10, 369 Mont. 407, 298 P.3d 1166, we analyzed the entire waiver statute and held a respondent could waive her right to attend an involuntary commitment hearing under § 53-21-119(1), MCA.  We also held the respondent need not attend a hearing in order to waive her right to attend the hearing.  "Nor is it necessary that the respondent be required to attend the proceeding against her will." *In re P.A.C.*, ¶ 15.  We did not address the mandatory presence requirement in § 53-21-126(1), MCA.  These two cases dealt more with the functionality of how a district court can accept a respondent's rights waiver: something more than an assurance from counsel, but less than requiring a hearing to waive the right to be present.

¶56    We addressed the subsections of § 53-21-119, MCA, in more detail in *In re S.D.*, 2018 MT 176, 392 Mont. 116, 422 P.3d 122, as the Opinion notes at ¶ 35.  We then affirmed the district court's acceptance of a respondent's waiver of a contested hearing and stipulation to an involuntary commitment under § 53-21-119(1), MCA.  *In re S.D.*, ¶ 16.  Justice McKinnon dissented, arguing the waiver statute specifically requires waiver of physical presence relying upon § 53-21-119(2), MCA.  Justice McKinnon argued "the Legislature established a specific procedure for protecting a respondent's due process rights when a hearing would adversely affect her mental condition.  Otherwise, as any other party must do, a respondent is required to appear at a hearing." *In re S.D.*, ¶ 24 (McKinnon, J., dissenting).  The majority and dissent views are not irreconcilable.  Justice Baker, writing for the Court, noted S.D. stipulated to the involuntary commitment, meaning she waived her right to challenge the proceeding under § 53-21-119(1), MCA.  *In re S.D.*, ¶ 18.

31

Justice McKinnon's argument is that waiving the proceeding itself requires following the more exacting standards of § 53-21-119(2), MCA, and a district court should not side-step those requirements by accepting a waiver of the entire proceeding without holding a hearing. *In re S.D.*, ¶ 24 (McKinnon, J., dissenting). Neither the Opinion nor the Dissent directly contradict each other's views that waiving rights generally falls under subsection (1), and waiving the right to presence falls under subsection (2).

¶57 We followed *In re S.D.* with *In re F.S.*, 2021 MT 262, 406 Mont. 1, 496 P.3d 958, wherein we reiterated the waiver statute's analysis from *In re S.D.* That includes the final component, quoted by the Opinion at ¶ 35, that waiver of physical presence is analyzed under subsection (2). We then held F.S.'s right to be present at the initial hearing could *only* be waived in accordance with § 53-21-119(2), MCA, and the district court erred in proceeding with the initial hearing in F.S.'s absence, but without following the waiver procedure mandated by subsection (2). *In re F.S.*, ¶¶ 10–11.

¶58 We then returned to generally discussing waiver of physical presence under either subsection of the statute when we decided *In re J.D.L.*, 2023 MT 64, 412 Mont. 25, 526 P.3d 1096. We noted initially the respondent could waive his physical presence himself under § 53-21-119(1), MCA, or his counsel and friend could waive his presence under § 53-21-119(2), MCA, if the conditions of that statute were met. *In re J.D.L.*, ¶ 10. We ultimately found the court did not strictly enforce the safeguards of § 53-21-119(2), MCA, when it allowed the respondent's attorney to waive J.D.L.'s physical presence due to concerns about his violence and impact upon his mental illness. *In re J.D.L.*, ¶ 17.

32

¶59 By carefully parsing the statute and this case history, we would ordinarily interpret the right to presence as waivable under either § 53-21-119(1) or (2), MCA, depending upon whether the specific circumstances of the case met the elements of each subsection. This is how the Court interprets the statute today.

¶60 But we run into two problems with that view. The first is the plain language of § 53-21-126(1), MCA. "The respondent must be present unless the respondent's presence has been waived as provided in 53-21-119(2)." Section 53-21-126(1), MCA. We read the statutes as a whole, giving effect to all of their provisions. Section 1-2-101, MCA. The statute governing contested case hearings requires the respondent to be present unless her presence is waived by § 53-21-119(2), MCA. It does not permit waiver of physical presence by § 53-21-119(1), MCA, from the contested hearing on involuntary commitment. Oddly, we have never addressed this first line in § 53-21-126(1), MCA, when examining waiver of physical presence, although it has been there all along. The Court should not "insert what has been omitted or to omit what has been inserted," and we should not ignore § 53-21-126(1), MCA, in our analysis. Section 1-2-101, MCA.

¶61 This comports with a more stringent waiver standard under subsection (2), because waivers of presence rationally require further safeguards for the respondent's rights. To waive a respondent's presence at the hearing on whether to be involuntarily committed for mental health treatment, the statute requires: (1) concurrence of the professional person; (2) concurrence of the judge; (3) a finding of serious adverse effect on the person's mental condition due to the person's presence in the courtroom; and (4) a finding the serious

33

adverse effect on the respondent will not be alleviated by conducting the hearing in an alternative location in surroundings familiar to the patient; or instead of (3) and (4), the court makes a finding (5) the respondent voluntarily expressed a desire to waive her presence at the hearing. Section 53-21-119(2), MCA; *see also In re S.D.*, ¶ 21 (McKinnon, J., dissenting) ("If the respondent is not present at [a] hearing, then the court must strictly follow waiver of physical presence as described in § 53-21-119(2), MCA.").

¶62    The second problem with the Court's interpretation of the waiver statute is the specific/general canon of interpretation. Codified under § 1-2-102, MCA, "When a general and particular provision are inconsistent, the latter is paramount to the former, so a particular intent will control a general one that is inconsistent with it." This designates subsection (2) as the only mechanism for waiving physical presence at trial. Subsection (2) specifically refers to "right of the respondent to be physically present at a hearing," and implements the presence requirement of § 53-21-126(1), MCA. Section 53-21-119(2), MCA. Subsection (1), on the other hand, refers to "the person's rights" in a general manner,[2] and it does not require the existence of a specific condition before a right may be waived. It only requires the attorney and friend (if there is one) to make a record of the reasons for the waiver. Section 53-21-119(1), MCA. By applying the specific/general cannon, we must apply the stricter standard to a waiver of physical presence. Otherwise, we render subsection (2) superfluous and we lessen the due process protections for the

---

[2] Other rights may include: "right to examination by a professional person of own choosing" under § 53-21-118, MCA, or other procedural rights under § 53-21-115, MCA, such as the "right to refuse any but lifesaving medication for up to 24 hours prior to any hearing" or "right to be dressed in the person's own clothes."

respondent. A court's reliance upon § 53-21-119(1), MCA, to waive a respondent's presence at the trial or hearing would be both legally incorrect and an abuse of discretion, because it would deprive her of two specific statutory safeguards: concurrence of the judge and professional person; and a finding that the hearing would have a serious adverse effect on her mental condition.

¶63 To be fair, these statutes have remained nearly identical since the 1970s, and they are not the model of clarity. The word "also" in subsection (2) might make § 53-21-119, MCA, flow more naturally when read as a whole, but it "also" undermines the exclusivity of subsection (2) as the only means to accept a waiver of physical presence. The inclusion of "also" could be interpreted to mean both subsections are viable ways to waive a respondent's presence. But the meaning of § 53-21-126(1), MCA, is not ambiguous; it requires the respondent to be physically present unless her presence has been waived "as provided in 53-21-119(2)." Section 53-21-126(1), MCA. It does not allow waivers under § 53-21-119(1) or (2), MCA, as the Opinion interprets the statute. Opinion, ¶ 40.

¶64 The history of the statute supports the separation of subsections (1) and (2). Initially passed in 1975, the two subsections were placed together.

> (2) In the case of a person who has been detained for a seventy-two (72) hour inpatient evaluation and treatment or for a longer period of time, a waiver of rights can be knowingly and intentionally made only with the concurrence of the patient's attorney or of the responsible person appointed by the court. The right of the respondent to be physically present at a hearing may also be waived by his attorney and the responsible person with the concurrence of the professional person and the judge upon a finding supported by facts that:

35

Section 38-1304(2), RCM (1975) (Romanettes (i) and (ii) remained mostly the same from 1975 until today).  The 1975 version of § 53-21-126, MCA, did not contain the "must be present" language or a cross-reference to subsection (2).  During the 1977 session, the Legislature created the presence requirement.

> (7) The respondent shall be present unless his presence has been waived as provided in 38-1304(2), and he shall be represented by counsel at all stages of the trial.

Section 38-1305(7), RCM (1977).  At the same time, the Legislature split the waiver of rights subsection into two different subsections:

> (1) Whenever a person is involuntarily detained, or is examined pursuant to 38-1305, the person shall be informed of his constitutional rights and his rights under this chapter.  A person may waive his rights, or his rights may be waived by his counsel and responsible person acting together if a record is made of the reasons for the waiver.  The right to counsel may not be waived. The right to treatment provided for in this chapter may not be waived.
> (2) The right of the respondent to be physically present at a hearing may also be waived by his attorney and the responsible person with the concurrence of the professional person and the judge upon a finding supported by facts that:

Section 38-1304(1), (2), RCM (1977) (Romanettes (i) and (ii) omitted).  The Legislature clearly split the two methods of waiver with the purpose to cross-reference directly to subsection (2).  Subsection (1), being intentionally excluded by the Legislature, does not apply to this case.

¶65    The Court also misapplies § 53-21-140(5), MCA.  *See* Opinion, ¶ 41. Section 53-21-140(1), MCA, creates an alternative method for T.W. to satisfy her required

presence at trial by allowing two-way electronic presence. The statute also requires

audio-visual communication to allow the parties to converse with each other.

> (1) For purposes of this chapter, a hearing that is conducted by the use of two-way electronic audio-video communication, *allowing all of the participants to be observed and heard by all present*, is considered to be a hearing in open court.
> (2) Whenever the law requires that a respondent or patient in any of the hearings provided for in subsection (3) be present before a court, this requirement may, in the discretion of the court, be satisfied either by the respondent's or patient's physical appearance before the court or by two-way electronic audio-video communication. *The audio-video communication must operate so that the respondent or patient, the respondent's or patient's counsel, and the judge can see each other simultaneously and converse with each other . . . .*

Section 53-21-140(1), (2), MCA (emphasis added). T.W.'s sought-after use, which

involves one-way spectating, is not authorized to satisfy her mandatory presence under

§ 53-21-126, MCA. Her requested use would require the District Court to first grant a

subsection (2) waiver. Subsection (5) also provides two other limitations on the use of

audio-visual communication.

> (5) A two-way electronic audio-video communication may not be used:
> (a) in an initial hearing provided for in 53-21-122 if the professional person objects; or
> (b) in a hearing referred to in subsections (3)(b) through (3)(g) if a respondent or patient, the respondent's or patient's counsel, or the professional person objects.

Section 53-21-140(5), MCA (Subsection (3)(c) is a "trial or hearing on a petition provided

for in 53-21-126," which is the trial at issue here). The Court is correct, T.W. could object

to two-way audio communications, but she would then have to be physically present at the

court proceedings. The only way to avoid both electronic and physical presence is through a waiver under § 53-21-119(2), MCA, but T.W. did not request complete exclusion.

¶66 The Opinion incorrectly concluded the District Court must have denied waiving physical presence under subsection (1), because the court did not ask the professional person for her conclusion or render any findings under § 53-21-119(2), MCA. Opinion, ¶ 40. When ruling on T.W.'s motion, the District Court only looked to the agreement of counsel and appointed friend. In the in-camera discussion and ruling on the motion, the District Court held "the request to appear—to waive her personal appearance and appear via Zoom is granted. But the microphone will be turned on and the video camera will be turned on." The court was granting electronic presence as an alternative to physical presence in the courtroom, which meets the requirements of § 53-21-140(2), MCA. That decision is within the District Court's discretion, and we should not overturn unless there was an abuse of discretion.

¶67 The Opinion also needlessly opines that the rights of privacy and dignity supersede the evidentiary interest of some of the key pieces of evidence. This is a statutorily-driven case, and we should not opine expansively upon the constitutional rights of dignity, for example, without recognizing the State is attempting to uphold T.W.'s right to dignity by rescuing her from the psychotic and self-harming state in which she was found. As we held only a few years ago:

> In that regard, the process afforded to respondents in civil commitment proceedings is the subject of a considered legislative response, and we should be cautious to extend constitutional protections that place the matter outside the arena of public debate and legislative action.

*In re S.D.*, ¶ 17 (citations and internal quotations omitted).

¶68 In commitment proceedings, the current behavior of the respondent, as she is sitting in the courtroom or on Zoom, has significant probative value. To justify commitment, the judge or jury must consider whether the respondent is suffering from a mental disease or disorder and due to that disease, she meets one or more of the following criteria: she is unable to care for her medical needs, a danger to herself or others, currently or recently committed acts causing self-injury, or her condition will predictably result in further deterioration of these factors without treatment. Section 53-21-126(1)(a)–(d), MCA. While the statute does not require the jury to consider in court appearance, a respondent's actions in court may be relevant when considering these factors. The Court errs by dismissing this evidentiary value.

¶69 Requiring two-way audio and video during a trial can hardly be compared to a defendant appearing in handcuffs during a proceeding. Opinion, ¶ 45 n.15. The latter is prejudicial per se, creating prejudice with absolutely no probative value whatsoever. The former, however, depends on the respondent's actions, actions which are probative of the respondent's current state of deterioration. Requiring the court to speculate about respondents' possible self-detrimental actions is completely unworkable. We have also previously cautioned against comparing civil commitment proceedings to criminal trials.

> Comparing the processes in criminal cases is not particularly helpful in resolving the question on appeal. Criminal procedural statutes provide different procedural requirements, stating for example that a plea of guilty must be entered in open court. We have recognized that the Sixth Amendment to the United States Constitution and Article II, Section 24, of

39

the Montana Constitution setting forth the rights of the accused do not apply to civil commitment proceedings. Civil commitment proceedings instead are protected by the constitutions' Due Process Clauses.

*In re S.D.*, ¶ 17 (internal citations and quotations omitted).

¶70 On that note, the Legislature amended the waiver statute during the 2025 Legislative Session. Senate Bill 435, which took effect on October 1, 2025, amends both the waiver statute, § 53-21-119, MCA, and the two-way audio-video communication statute, § 53-21-140, MCA. 2025 Mont. Laws ch. 609, § 2. We have required strict adherence to Montana's civil commitment statutes. *In re T.M.*, ¶ 7. In so doing, we should not inject constitutional standards into our statutory interpretation unless absolutely necessary. It is not necessary in this instance.

/S/ CORY J. SWANSON

Justice Jim Rice joins the Concurrence and Dissent of Chief Justice Cory J. Swanson.

/S/ JIM RICE